**Grandon REED, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 71S00–9911–CR–654.

Supreme Court of Indiana.

June 8, 2001.

---

Mark S. Lenyo, South Bend, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

Grandon Reed was convicted of the felony murder of Brian Cichocki and sentenced to sixty-five years imprisonment. In this direct appeal, he contends that: (1) Reed was denied his Sixth Amendment right of confrontation when the trial court refused to compel the deposition of prosecution witness Brandon Williams; (2) the trial court abused its discretion when it refused to permit Reed to impeach Williams with a videotaped interview between prosecutors and Williams; (3) the trial court erred in admitting the hearsay statements of Takiya Posey where Posey was not called as a witness by the State; and (4) the evidence was insufficient to support the conviction.

We conclude that the trial court abused its discretion in refusing to allow Reed to impeach Williams with his prior inconsistent statements and that this error prejudiced Reed. We reverse the conviction and remand for a new trial.

**Factual and Procedural Background**

On April 22, 1998, at approximately 9:00 p.m., a man wearing a black ski mask, black leather gloves, and a tan or cream colored coat entered Archie's Place, a barbecue restaurant in South Bend, pulled a black gun, and demanded money from the cashier, Tamika Fultz. As Fultz gathered the money from the register, she noticed that the outside door remained open. Because the door normally closed itself, she assumed that a second person was holding it open. After Fultz handed approximately $500 to the gunman, the gunman suddenly turned and shot Brian Cichocki, a customer who was waiting for his takeout order. Fultz dialed 911 and police were dispatched at 9:18 p.m. Cichocki suffered a gunshot wound to his left shoulder and died of severe blood loss later that night. Ballistics tests and a shell casing retrieved

from the scene revealed that the lethal bullet was fired from a nine-millimeter gun.

## A. *The Investigation*

Brandon Williams, seventeen years old, lived a few blocks away from Archie's Place. The day after the robbery, police questioned Williams after receiving a tip that he had been involved in the crime. Williams initially denied any involvement, but later that day admitted that the prior evening he had accompanied Reed to Archie's Place. Williams said that he held the door as Reed unexpectedly robbed Fultz and shot Cichocki.

Reed, who had just turned eighteen, was picked up by police and interviewed by Officer Richmond. In the course of the interview, Reed's mother, Darla Pfeifer, arrived at the police station. Although Pfeifer was not allowed to speak with Reed at that time, she signed a consent form allowing police to search her house. Police discovered a nine-millimeter AB-10 or "Baby Tec 9" handgun and bullets in the garage. They also found two black ski masks, a pair of black knit gloves, a tan coat, and a green jacket in Reed's room. Reed was arrested based on the fruits of the search. Ballistics tests later showed that the gun seized in the garage was not the weapon used to kill Cichocki.

Pfeifer was present as the police searched her home. After the AB-10 was found in her garage, she halted the search and returned to the station where she was allowed to speak with Reed in the interview room. The police routinely videotape everything that occurs in the interview room and captured the conversation between Reed and Pfeifer. Reed's interrogation by police was on the same tape, immediately before and after his conversation with Pfeifer. Although the portion of the tape containing the Reed/Pfeifer con-versation is largely unintelligible, Pfeifer can be heard instructing her son to "shut up" and "just be quiet." Reed and Pfeifer can also be heard discussing the AB-10. When Pfeifer asked Reed if the gun had been used in a shooting, Reed replied that "the gun has never been fired." Pfeifer asked Reed if he shot Cichocki, to which he replied that he "didn't shoot anybody." Immediately following the conversation between Reed and Pfeifer, police placed Reed under arrest.

## B. *Pretrial Maneuvers*

Six months later, on August 20, 1998, Williams entered into a plea agreement with the State. In return for his agreement to testify truthfully against Reed, the two counts of robbery and one count of felony murder against Williams were dropped and he was allowed to plead guilty to assisting a criminal, a Class C felony.

Reed first attempted to depose Williams on December 2, 1998. When it became clear that Williams would not voluntarily give a deposition, Reed filed a motion to compel. After hearing argument on December 4, 1998, the trial court denied that motion. The court took the view that because Williams' guilty plea had not yet been unconditionally accepted by the court, Williams was still in jeopardy and could stand on his privilege against self-incrimination. On April 29, 1999, after learning that Williams had submitted to a lengthy videotaped interview with prosecutors, Reed renewed his motion to compel a deposition. On May 7, 1999, a brief hearing was held on the renewed motion. Reed argued that Williams had waived his Fifth Amendment rights by videotaping an interview with the prosecutor on April 23, 1999. The court rejected that argument and also stated that it had "no power to order the State to extend use immunity or

seek use immunity from a court before the State wishes to do so." The motion was denied. At that time there appears to have been no request to compel production of the videotape. In the context of debating whether Williams had waived any Fifth Amendment rights, the prosecutor claimed the interview was privileged as plea negotiations. The trial court agreed, stating that "any statements . . . by Brandon Williams were under plea discussions and not discoverable nor usable against him unless they were for perjury down the road." Reed asked that this order be certified for interlocutory appeal and that request was also denied. A copy of the videotaped interview with prosecutors was turned over to Reed at some point before trial, but the record does not indicate when or why. The State finally requested use immunity for Williams on July 2, 1999, immediately before he took the stand to testify.

A second videotape was also the subject of a pretrial motion by Reed. Reed moved to suppress the videotaped conversation between Reed and Pfeifer and also filed a motion in limine to prevent the State from admitting the AB–10 into evidence or discussing it at trial. On June 29, 1999, after the jury had been chosen, a hearing was held. The record of the hearing indicates some confusion over whether the hearing was limited to the motion to suppress the videotape or whether it also addressed the motion in limine to exclude the gun and other items. After it became clear that the trial court intended to rule on both motions immediately after the hearing, Reed attempted to argue that the AB–10 should not be admitted as evidence or discussed at trial because it was clearly not the murder weapon and bore no relationship to the crime. The prosecutor countered that during the videotaped conversation with his mother, Reed "says information that would indicate that he knows that the weapon used at Archie's was a different weapon" and "it would show relevance that Mr. Reed is familiar with the Tec 9." The trial court ultimately denied the motion to suppress and denied the motion in limine as to the AB–10.

### C. *Williams' Testimony at Trial*

At the time of the crime, both Reed's mother, Pfeifer, and his girlfriend, Takiya Posey, worked at Cardinal Nursing Home, approximately 1 mile from the Reed/Pfeifer home. According to Williams, on the morning of the crime he and Reed rode their bicycles to Cardinal to pick up Pfeifer's car. He said the pair found Pfeifer at work, got the car keys from her, and took the car from the nursing home parking lot. Reed then drove the pair in Pfeifer's car to an unknown location on the southeast side of South Bend where Williams purchased a Tec 9 handgun from a man known only as "Terry." Cardinal's payroll records indicate that Pfeifer did not work that day. Pfeifer was not asked by either party whether the records were correct.

Williams testified that Reed stopped by his home on the evening of the crime and suggested that they get a bite to eat at Archie's Place. Williams had last seen his newly purchased gun on the ledge in his basement room. Reed and Williams walked to Archie's Place, which took approximately five minutes. As Williams held the door for Reed to walk into the restaurant, Reed suddenly pulled his ski mask over his face and said, "Get down. Give me the money." After about thirty seconds, with Reed still in the store, Williams released the door and started to run home. En route, he heard a gunshot. Reed, carrying a handgun that looked like a Tec 9, caught up with Williams and the two then walked to Williams' house. No words were spoken. Reed set the gun down on the coffee table in Williams' room

and the two then went to Reed's house. Around 10:30 or 11:00 p.m., Williams returned to his own home, placed the gun in a blue bookbag, and disposed of it in a trash can in the alley behind the house where Michelle Thomas, a friend and neighbor of Williams, and Teresa Glasper, Thomas' roommate, lived. The next day, he retrieved the bag from the trash can and paid a visit to Thomas and Glasper, accompanied by Posey. After chatting with the women, he then returned the bag to the trash can in the alley.

## D. *The Other Evidence*

Fultz testified that an unidentified gunman robbed her and shot Cichocki and that she assumed another person held the door open. Fultz also testified that the gunman wore a tan or beige jacket and black ski mask, but was not asked whether the tan coat and black ski masks found at Reed's home matched those worn by the gunman.

Over Reed's repeated objections, the gun, bullets, ski masks, tan jacket, and green jacket seized at Pfeifer's home were discussed in testimony by the police. Either photos or the actual items were also admitted as evidence.

The State played three portions of the videotaped conversation between Pfeifer and Reed to the jury. The State's theory of its relevance was that it undercut Pfeifer's testimony in support of Reed's alibi that at the time of the crime, Reed was walking Posey home from work. The State contended that if Pfeifer knew that Reed could not have committed the crime, she would not have asked him if he had. This appears to assume that Pfeifer knew the precise timing of the crime and the time she spoke with Reed on the night of the crime, and we find no evidence one way or another on that point.

In support of Williams' testimony on the chain of events, the prosecution presented two witnesses. Thomas testified that Williams told her on the morning of the crime that he wanted to purchase a gun. Glasper testified that later that afternoon Williams returned to their house with a black gun with holes on the end. Neither woman testified that she saw Reed that day.

## E. *Reed's Defense*

At trial, Reed contended that he could not have participated in the robbery and murder because at or immediately before the time of the crime he was walking Posey home from her job at Cardinal. Reed presented five alibi witnesses. Pfeifer testified that Reed left her home on foot at 8:25 or 8:30 p.m. to meet Posey at the nursing home and walk her home. Cardinal's director of human resources testified that Posey's computer-generated timecard indicated that she clocked out at 8:42 p.m. on the night of the crime. Two of Posey's co-workers testified that they saw Posey and Reed at the nursing home between 8:30 and 8:45 p.m. Reed's home is a few blocks away from Archie's Place and slightly less than one mile from Cardinal. Cardinal and Archie's are seven-tenths of a mile apart. Reed argued that it would not have been possible for him to leave the nursing home around 8:45 p.m., walk Posey home, walk to Archie's Place, and then participate in a robbery and murder all before the police's arrival about 9:18 p.m.

After a jury trial, Reed was convicted of the robbery of Archie's Place and the murder of Brian Cichocki. Citing double jeopardy, the trial court merged the robbery conviction into the felony murder conviction and sentenced Reed to sixty-five years in prison. Reed filed a motion for a mistrial, arguing many of the same points raised in this appeal. That motion was

denied and Reed subsequently appealed his conviction to this Court.

## I. The Significance of Williams' Testimony

■ Williams' testimony was the cornerstone of the prosecution's case against Reed. As we observed in *Birkla v. State,* "When the prosecution relies upon the testimony of a coconspirator to obtain conviction of an accused, the coconspirator's credibility is an important issue in the case...." 263 Ind. 37, 42, 323 N.E.2d 645, 648 (1975). Here, Williams' credibility was not merely important, it was critical. The State presented no physical evidence tying Reed to the crime scene and no eyewitnesses identified Reed as the masked gunman. The gun used in the crime was not Reed's and was never found. None of the money or personal effects taken from the victims was recovered or linked to Reed. The State's entire case rested on Williams' testimony that he had been involved in the crime and that Reed was the triggerman. Thomas and Glasper provided testimony that was consistent with Williams' story that he and Reed purchased a handgun on the day of the crime. The two women also partially corroborated Williams' account of disposing of the handgun later that day. However, no evidence corroborated the heart of Williams' testimony—his account of the events immediately before, during, and after the robbery of Archie's Place.

## II. Sixth Amendment Right of Confrontation

■ Reed was unsuccessful in his effort to depose Williams. Reed contends that the trial court's refusal to compel the deposition denied him his Sixth Amendment right of confrontation.[1]

■ *Bubb v. State* noted that, although a defendant has no due process right to compel the immunization of defense witnesses, the State cannot use its power of immunization to interfere with the defense's presentation of its case. 434 N.E.2d 120, 124 (Ind.Ct.App.1982). Williams was not a defense witness in the case against Reed; indeed, he was the key witness for the prosecution, but we think the same principles apply. The issue is whether the State's refusal to immunize Williams earlier improperly interfered with Reed's case and violated the Due Process Clause. The Court of Appeals, borrowing language from the Third Circuit, outlined a strict test:

> [T]he evidentiary showing required to justify reversal on that ground must be a substantial one. The defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact-finding process. Where such a showing is made, the court has inherent remedial power to require that the distortion be redressed by requiring a grant of use immunity to defense witnesses as an alternative to dismissal.

*Id.* (quoting *United States v. Herman,* 589 F.2d 1191, 1204 (3d Cir.1978)); *accord United States v. Schweihs,* 971 F.2d 1302, 1315 (7th Cir.1992). Interference with the defendant's case or distortion of the fact-finding process may be established by showing:

> (a) prosecutorial overreaching, through threats, harassment, or other forms of intimidation, has effectively forced the witness to invoke the Fifth Amendment, or the prosecutor has engaged in discriminatory use of immunity grants to gain a tactical advantage; (b) the witness's testimony is also material, excul-

1. A similar right is guaranteed by Article I, Section 13 of the Indiana Constitution. However, Reed did not raise this argument and we do not discuss it.

patory, and not cumulative; and (c) the defendant has no other way to obtain the evidence.

*Baxter v. State,* 727 N.E.2d 429, 433 (Ind. 2000); *Moore v. State,* 655 N.E.2d 1251, 1253 (Ind.Ct.App.1995) (quoting *Blissett v. Lefevre,* 924 F.2d 434, 442 (2d Cir.1991)).

Reed does not cite *Bubb* or *Baxter,* nor does he do more than mention this argument in his brief. Nonetheless, the record establishes that the State's continued and vigorous opposition to Reed's efforts to depose Williams and its refusal to grant use immunity until moments before Williams took the stand at Reed's trial constituted interference with Reed's case.

The State offers no explanation for the prosecutor's continued attempts to block Reed's motions to compel Williams' deposition. We can see none other than an effort to gain improper tactical advantage. Williams entered into a plea agreement on August 20, 1998. It is clear from the record that the State intended to grant Williams use immunity at least as of the videotaped interview on April 23, 1999, if not much sooner. That was two weeks before the hearing on Reed's second motion to compel Williams' deposition. The prosecutor delayed her request for immunity until July 2, 1999, the day that Williams testified at Reed's trial. Indeed, at the second hearing on Reed's motions to compel Williams' deposition on May 7, the State actively argued against the motion. Williams' lawyer was present but said nothing.

At the time that Reed sought to depose Williams, the only clues Reed had to this key witness' testimony were two partially contradictory statements Williams had made to police the day after the murder. Reed had no way of knowing whether Williams' testimony could or would be exculpatory because he had no idea what that testimony might be.

At the time of the second hearing on May 7, prosecutors continued to maintain that a deposition was useless because it would produce only claims of Fifth Amendment privilege, and also that the now revealed videotape was "privileged." [2] The timing or reasons for release of the tape are not in the record. We can only speculate that it was done for *Brady* concerns, or perhaps in an effort to cure the error in blocking a pretrial deposition of Williams.

In any event, it is not correct that the taped interview was not discoverable or usable at Reed's trial. The use of prior inconsistent statements to impeach a witness is well established. *Chambers v. State,* 734 N.E.2d 578, 580–81 (Ind.2000). Indiana Rule of Evidence 410 and Indiana Code section 35–35–3–4 provide that statements made in connection with a contemplated plea agreement may not be used against a defendant if the agreement is not finalized. Both the rule of evidence and the statute are clear that use of plea negotiations is prohibited only as to the negotiating accused person, in this case, Williams. There is simply no privilege insulating Williams' dialogue with the prosecution from discovery or use in

**2.** The State represented to the court that the videotaped interview constituted plea negotiations, not trial preparation. The tape itself makes clear that it was witness preparation and/or investigation, not plea negotiations. At the beginning of the interview, the prosecutor stated:

The State of Indiana is prepared to file a request for immunity, use immunity, which

guarantees immunity to Mr. Williams for truthful testimony regarding all the events of April 22, 1998, and April 23, 1998, with one exception. That being, should Mr. Williams testify that he personally committed the armed robbery of Brian Cichocki and or the felony murder of Brian Cichocki based on the shooting he will not be covered by the immunity.

Reed's case. *United States v. Testa,* 33 F.3d 747, 751 (7th Cir.1994) (holding that under Federal Rule of Evidence 410, statements made in the course of plea negotiations are inadmissible only against defendants who participated in those negotiations); *Elmer v. State,* 353 Md. 1, 724 A.2d 625, 629 (1999) (holding that Maryland Rule of Evidence 5–410, a counterpart to Federal Rule 410 and Indiana Rule 410, does not prohibit the admission of statements made by a codefendant during the course of plea negotiations against the defendant as long as the defendant was not a party to the negotiations).

Release of the videotape to the defense did not cure this situation. The inability to depose Williams left Reed with no opportunity to expose several inconsistencies in Williams' various accounts. For example, Williams' account of his disposal of the murder weapon at trial was significantly different from the version he told prosecutors on videotape on April 23, 1999.[3] At trial, Williams testified that immediately after the crime he saw Reed holding the Tec 9 that the two of them had purchased earlier that day. In his original police interview on April 23, 1998, Williams specifically denied seeing Reed with a gun that evening, and the videotape did not address that issue.

At the very least, Reed was entitled to access to Williams prior to trial to have an opportunity to develop and pin down Williams' testimony on these and any other potential points or at least have sworn testimony to impeach any variances. In the often quoted but worth repeating phrase from *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970): "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." The prosecutor's effort to hide the ball until the day of trial plainly violated that cardinal principle.

■■■ The prosecutor's handling of the immunity left the trial court with three alternatives. The trial court was correct that it could not compel immunity. *See United States v. Bowling,* 239 F.3d 973, 976–77 (8th Cir.2001). However, it could exclude Williams' testimony, dismiss the prosecution if no deposition was permitted, or grant a continuance for sufficient time to permit Reed to depose Williams and prepare a defense. *See United States v. Morrison,* 535 F.2d 223, 229 (3d Cir.1976). After the trial court granted immunity to Williams, Reed needed to renew his request to depose Williams and, if necessary, move for a continuance in order to preserve the issue. Reed did not do so. However, the combination of this unpreserved error and the trial court's refusal to admit the videotape to impeach Williams, as discussed in Part III, constitutes reversible error.

### III. Refusing to Admit the Videotape

■■■ Reed contends that the trial court abused its discretion by refusing to allow

---

**3.** In the interview with prosecutors, Williams stated that when he returned from Reed's house on the night of the crime, he relaxed in his basement bedroom before falling asleep. The next morning, he awoke around 11 a.m., picked up the gun from his coffee table and threw it into a trash barrel behind a house one or two doors west of the home of Thomas and Glasper. Williams specifically denied taking the gun out of the trash barrel after placing it there or going to Thomas and Glas-

per's house with a bag. At trial, Williams testified that, after leaving Reed's house on the night of the crime, he returned to his own home, placed the gun in a blue bookbag and disposed of it in a trash can in the alley behind Thomas and Glasper's house. The next day, he retrieved the bag from the trash can and, accompanied by Posey, paid a visit to Thomas and Glasper. After chatting with the women, he returned the bag to the trash can.

him to play the videotape of the prosecutor's April 23, 1999, interview with Williams. The trial court's decision, Reed argues, interfered with his right to cross-examine Williams and impeach his inconsistent testimony and therefore prejudiced him.

[12–16] The right to cross-examine witnesses is guaranteed by the Sixth Amendment to the United States Constitution. It is "one of the fundamental rights of our criminal justice system." *Pigg v. State,* 603 N.E.2d 154, 155 (Ind.1992). To be sure, "this right is subject to reasonable limitations placed at the discretion of the trial judge." *McQuay v. State,* 566 N.E.2d 542, 543 (Ind.1991); *accord Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "[T]rial judges retain wide latitude ... to impose reasonable limits ... based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Thornton v. State,* 712 N.E.2d 960, 963 (Ind.1999) (quoting *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431). It is also true that violations of the right to cross-examine are subject to harmless error analysis. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431; *accord Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (a conviction will not be reversed if the State can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). To determine whether an error is harmless, courts look to several factors, including the strength of the prosecution's case, the importance of the witness' testimony, whether the testimony was corroborated, the cross-exami-

nation that did occur, and whether the witness' testimony was repetitive. *Van Arsdall,* 475 U.S at 684, 106 S.Ct. 1431.

Reed contends that he could not anticipate the substance of Williams' trial testimony because he had access only to a transcript of Williams' statements to police the day after the crime and a videotape of Williams' interview with prosecutors on April 23, 1999.[4] After Reed concluded his cross-examination of Williams in the early afternoon of Friday, July 2, 1999, the judge released the jury for lunch. When the court reconvened at 3:00 p.m., Reed requested permission to have some portions of the April 23, 1999, videotape marked as evidence and played for the jury in order to demonstrate that Williams was "untruthful in his testimony in relation to his earlier statement to [the prosecutor]." Reed explained that during the lunch break he had identified a number of inconsistencies between Williams' testimony on direct and cross-examination and his videotaped statement of April 23. Specifically, Reed alleged that Williams told different stories about his initial purchase of the murder weapon, his description of his activities on the afternoon of the crime, and his disposal of the murder weapon.

A comparison between the videotape and the transcript of Williams' testimony at trial reveals that inconsistencies do exist.[5] In the interview, the prosecutor asked, "So [Reed] tells you there is a firearm for sale. Who did he tell you had it for sale?" Williams replied, "I couldn't really tell you." The prosecutor continued, "Did you ever learn the name of the guy that you bought the gun from?" Williams answered "no." Yet at trial, the

---

4. The State did not provide Reed with a transcript of the videotape, nor did Reed attempt to create a formal transcript prior to trial.

5. The videotape was not admitted into evidence, but identified as "Defendant's Exhibit PUB–MTN" and included in the record.

following dialogue took place on cross-examination:

Q: Who did you buy the gun from?

A: A person on the southeast side.

Q: Okay. What is that person's name?

A: Terry.

Q: Now, when you met with the prosecutor on April 23, 1999, you were asked who you bought the gun from. Right?

A: Yes.

Q: You said you didn't know; isn't that right?

A: I guess so.

Q: So was that a lie to Ms. Jourdan?

A: Not necessarily, I don't know him like that. I know him by Terry. She didn't ask me for a name. She just asked me did I know him or who he was.

Williams' testimony offers a different account of the events directly following the purchase of the gun than that conveyed to prosecutors in the April 23, 1999 interview. At that time, Williams stated that after purchasing the gun, he and Reed went directly to his home where Williams placed the gun on a ledge in his basement. They went to Reed's house for a while and then drove Pfeifer's car back to the Cardinal Nursing Home and returned the keys to her. They walked to a nearby 7–11 store and "smoked a blunt" with a girl who worked there. Williams then went home and was soon joined by Reed. The two listened to music together for a while and then decided to go over to Thomas and Glasper's house, which Williams described as a "neighborhood hotspot." While there, Reed and Williams had a general conversation about guns, but did not specifically mention the gun purchased that day.

At trial, Williams testified that he did not put the gun on the ledge in his basement. Instead, he kept the gun tucked in his pants. After returning home from purchasing the gun, Williams and Reed split

up and Williams went to visit Thomas and Glasper. Although he did not directly show them the gun, Williams testified that the women could see the gun through his clothing. After returning from visiting the two women, Williams placed the gun on the ledge in the basement.

Williams also offered two different accounts of his activities immediately following the crime. In the interview, Williams stated that he and Reed first went to Williams' home where Reed left the murder weapon on a coffee table. The two men then went to Reed's home where Reed spoke with his mother and girlfriend before Williams and Reed retired to the basement to watch television. After a news segment on the shooting concluded, they rode Reed's little brothers' bicycles to the local 7–11 to purchase candy and some beverages. They met "a dude named Chris Buggs" at the store, sat in his car and chatted for a while, and then rode the bikes back to Reed's home. At that point, Williams "called it a night" and returned to his own house.

At trial, Williams testified that, immediately after the crime, he and Reed went to Williams' house where Reed left the gun on the coffee table. They both went to Reed's house where Reed spoke with his mother. After "no longer than a half hour," Williams went home.

Finally, Williams offered two drastically different stories regarding his disposal of the murder weapon. At trial, Williams testified that, after leaving Reed's home on the night of the crime, he returned to his own home, placed the gun in a blue bookbag and disposed of it in a trash can in the alley behind the house where Thomas and Glasper lived. The next day, he retrieved the bag from the trash can and, accompanied by Posey, paid a visit to Thomas and Glasper. After chatting with the women,

he then returned the bag to the trash can in the alley.

But in the videotaped interview, Williams stated that when he returned from Reed's house on the night of the crime, he listened to music and made some calls before falling asleep. The next morning, when he woke up around 11:00 a.m., the gun was still on the coffee table. Sometime before noon, he threw the gun into a trash barrel behind a house one or two doors west of the home of Thomas and Glasper. Williams specifically denied that he ever took the gun out of the trash barrel after placing it there and denied going to Thomas and Glasper's house with a bag. The prosecutor asked Williams if he and Posey went to Thomas and Glasper's house at any time that day and Williams definitively stated, "[Posey] didn't go over there." He repeatedly denied that Posey went to the house or that she knew either Thomas or Glasper. The prosecutor expressed some doubt about Williams' account: "So you want me to believe that you dumped [the gun] in a barrel out in broad daylight sometime after eleven and before twelve?" "Yeah," Williams replied.

The prosecutor objected to playing the entire videotape to the jury on two grounds. She contended Reed had been supplied a copy of the tape two months before trial and could have prepared an excised copy. She also took the position that "there are other questions and answers on the tape which have not been impeached in any way which may in fact make me akin to a witness." Reed countered that it was impossible for him to prepare an excised copy of the tape prior to trial because he had been denied the ability to depose Williams and therefore had no basis to know how Williams' story might have changed between April 23, 1999, and trial.

The trial court denied Reed permission to play the tape, explaining that in his view Williams had been sufficiently impeached on his inconsistent statements. Reed then asked for funds to have the tape edited over the weekend so that he might show the jury the relevant portions of the tape. The trial court denied this request as well.[6]

6. The trial court's refusal to allow Reed to play portions of the videotape to impeach Williams testimony is particularly troubling in light of its handling of an earlier tape offered by the prosecution. When State witness Officer Richmond was admitted to the hospital, suffering from chest pains, and was unexpectedly unable to testify, the State requested that, in lieu of Richmond's testimony, the trial court play for the jury the hour-long unexpurgated copy of the videotaped interview between Reed and police made immediately before his arrest. Reed, caught off guard by this request, argued that portions of the videotape and transcript were inadmissible. For example, this tape included discussion of Reeds juvenile record and a statement by Reed: I don't like being around police officers. I've been locked up too long, too many times. The trial court cautioned the prosecutor to be ready with their squash button to prevent the jury from hearing two specific parts of the videotape, but refused to delay playing the tape for the jury in order to allow Reed to prepare an excised copy.

The trial court expressed concern about making the jury wait and stated that Reed should have raised objections to the admissibility of any statements on the videotape during the June 29, 1999, suppression hearing. However, a review of the record makes it clear that Reed's motion to suppress did not address his interview by police and there was no discussion of that interview at the suppression hearing. At the time, Reed had no reason to anticipate that the interview would be used at trial.

Both the videotape and the transcript were admitted into evidence. The videotape was shown to the jury and copies of the transcript were provided to each juror. The record does not indicate which portions, if any, of the videotape were squashed. [I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist

Although Reed was able to cross-examine Williams on specific inconsistent statements, that impeachment was compromised by the trial court's refusal to play the videotape for the jury. For example, in one exchange, Reed pressed Williams about the significant differences between the story he told prosecutors on April 23, 1999, and his testimony at trial concerning his disposal of the murder weapon:

Q: Now, you spoke with [prosecutor] Ms. Jourdan on April 23, 1999; isn't that right?

A: Yes.

Q: And when you spoke to her about what you did with the gun, you told—didn't you tell her that you left that gun on the coffee table all night?

A: No.

Q: You didn't tell her that?

A: No.

Q: You didn't tell her that it remained on the coffee table until you got up the next morning at 11 a.m.?

A: No, because at 11 a.m. I had already left.

Q: Okay. So absolutely you're saying that you did not say that to Ms. Jourdan?

A: I don't recall saying that to Ms. Jourdan.

Q: And you didn't tell Ms. Jourdan that after you left at—or got up the next morning, that you took that gun in broad daylight, walked across, and then dumped it in a trash barrel?

A: I don't recall saying that.

Q: And didn't you tell Ms. Jourdan—or you didn't tell anything to Ms. Jourdan about putting it in a book bag; isn't that right?

A: I don't recall—where are you getting this from?

Q: Well, you gave a videotaped interview to her in which you answered questions. Right?

A: Yes.

A review of the videotape reveals that Reed's account of Williams' statements was correct. However, without the benefit of watching the videotape, the confrontational series of questions and answers between Reed and Williams appears more as conflicting memories of a dialogue than a presentation of proof that Williams had come up with inconsistent accounts.

Given the critical role of Williams' testimony, the fact that all other evidence and testimony against Reed was circumstantial, and the State's consistent opposition to Reeds' attempts to depose Williams before trial, Reed was prejudiced by the trial court's abuse of discretion in refusing to play relevant portions of the videotape for the jury and thus allowing Reed to conduct a full cross-examination of Williams.

The problems in producing an edited version were largely attributable to the prosecution's and the trial court's withholding the tape until shortly before trial, and the inability of the defense to predict what the testimony would be due to the stonewalling of proper discovery. In concert with the States' improper interference with Reeds' attempts to depose Williams before trial, Reeds' ability to present a

that trials be run as a search for truth so far as defense witnesses are concerned, while maintaining poker game secrecy for its own witnesses.
*Wardius v. Oregon,* 412 U.S. 470, 475–76, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (holding that, although the Due Process Clause does not mandate the adoption of discovery procedures in criminal cases, in the absence of a strong showing of state interests to the contrary, any discovery procedure adopted must be reciprocal and fair).

defense was substantially prejudiced. A new trial is required.

## IV. Hearsay Issues

■■■ Reed argues that the trial court erred in allowing Michelle Thomas to testify as to hearsay statements allegedly made by Takiya Posey. Thomas testified that the day after the crime, a woman claiming to be Reed's girlfriend came to her house. Over repeated hearsay objections, the trial court allowed the following set of questions and answers:

Prosecutor: What did she want?

Thomas: She said that she was [Reed's] girlfriend and that she wanted to retrieve a bag that she said [Williams] left at my house.

P: What was your response to her?

T: I told her [Williams] didn't leave no bag at my house, that I told him no.

P: What happened after you told her that?

T: She said that he left it in my back yard.

In response to Reed's objections, the trial court admonished the jury that the two statements were hearsay and:

That doesn't make it true or not true or anything else. You can't use it for that purpose. You can't use it to bolster some other testimony about where a bag may or may not have been left. It doesn't count towards that. It only counts for what this witness says she heard as a basis for her doing something or not doing something or saying something that she's now testifying to.

Thomas proceeded to testify that she watched the woman poke around her backyard for five to ten minutes, then take a bag out of a trash barrel behind the house and leave in a car.

Thomas' roommate, Teresa Glasper, testified to the same set of events. Glasper knew Posey and testified that Posey came to the house the evening after the crime to retrieve the bag that Williams had left in the backyard earlier that day. Glasper also testified that she watched Posey look around the yard, take a bag, and then depart in a car. Unlike Thomas, Glasper did not testify to any statements made by Posey and presented no hearsay issues. Reed did not object to Glasper's identification of Posey or her testimony that Posey took a bag from the trash barrel.

Reed did not ask for a mistrial after Thomas testified and the trial court properly admonished the jury. Therefore, any error is waived unless it constitutes fundamental error. Because Glasper testified to the same set of events, the evidence is cumulative and therefore not reversible error. *Davidson v. State*, 558 N.E.2d 1077, 1089 (Ind.1990).

## V. Insufficient Evidence

■■■ Finally, Reed argues that the evidence was insufficient to support his conviction and that the "incredible dubiosity rule" should be applied to Williams' testimony. Our standard of review for sufficiency claims is well settled. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Taylor v. State*, 681 N.E.2d 1105, 1110 (Ind.1997).

■■■ Williams was the only witness to place Reed at the scene of the crime and identify him as the triggerman. He was not a model witness. Some of his testimony was improbable and he was impeached by a number of prior inconsistent statements. However, judging the credibility of witnesses is the province of the jury and a court will impinge on that responsibility

only in those rare cases where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt. *Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994).

 This "incredible dubiosity rule" does not apply here because Williams' testimony did not rise to the level of "inherent contradiction," nor was it equivocal or the result of coercion. As a result of the trial court's erroneous decision to limit Reed's ability to cross-examine Williams, a retrial on these charges will presumably take place. Because the "incredible dubiosity rule" does not preclude the jury from judging Williams' credibility and the uncorroborated testimony of one witness is sufficient to sustain a conviction on appeal, *Toney v. State*, 715 N.E.2d 367, 368 (Ind. 1999), retrial is not barred on double jeopardy grounds. *Thompson v. State*, 690 N.E.2d 224, 237 (Ind.1997).

### Conclusion

We conclude that the trial court erred in refusing to compel the deposition of Williams and in refusing to allow Reed to play Williams' videotaped interview with prosecutors for the jury. We remand for a new trial.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.