**In The Matter of A.W., a Delinquent Child.**

No. 54A01–0101–JV–25.

Court of Appeals of Indiana.

Oct. 18, 2001.

Ian A.T. McLean, Crawfordsville, IN, Attorney for Appellant.

Harry A. Siamas, Collier, Homann & Siamas, Crawfordsville, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

During juvenile delinquency proceedings for A.W., the juvenile court ordered A.W.'s father ("Father"), and A.W.'s stepmother ("Stepmother"), to undergo assessments to determine whether counseling should be required based upon A.W.'s allegations that Father molested her. Father and Stepmother[1] bring this interlocutory appeal from the juvenile court's order.

We reverse and remand.

### ISSUE

The dispositive issue is whether the dispositional order requiring Father and Stepmother to undergo assessments and any attendant counseling was entered without proper notice in violation of Father and Stepmother's due process rights and the procedures required by statute.

### FACTS

On September 10, 1999, a petition for the emergency detention of A.W. was filed in Montgomery County Circuit Court Juvenile Division under cause number 54C01–9909–JD–136 (JD–136), alleging, inter alia, that A.W. had been "charged with Delinquency/Runaway on numerous occasions by the Crawfordsville Police Department." (Appellants' App. 9). On September 13, 1999, the juvenile court ordered A.W.'s detention at Scholer Home for a period not to exceed 30 days "in order to provide for [A.W.'s] protection, structure, and supervision." (Appellants' App. 11).

With the permission of the juvenile court, a delinquency petition was filed on September 29, 1999 noting that A.W. resided with her mother ("Mother"). A.W. was released to the custody of an aunt, but another emergency detention was ordered within the delinquency proceeding when A.W. left her aunt's home without permission. On October 14, 1999, the juvenile court entered an order for a Court Appointed Special Advocate (CASA) for A.W.

On November 23, 1999, after an evidentiary hearing aimed at addressing the issue of whether A.W. was a runaway, A.W. was adjudged a delinquent child and a predispositional report was ordered. In December 1999, without permission, A.W.

---

1. Father and Stepmother are parties in the proceedings inasmuch as the "child[,] ... [the] child's parent, guardian, or custodian, and ... [the] prosecuting attorney are parties to" juvenile law proceedings "and have all rights of parties provided under the Indiana Rules of Trial Procedure." Ind.Code § 31–37–10–7. The statute does not specifically include stepparents; however, because the court's order included Stepmother and the statute includes guardians and custodians, we will address the matter as though she is a party. Thus, according to the statute Father and Stepmother may bring an interlocutory appeal as provided by the trial rules.

left the placement that had been ordered at Cary Home in Lafayette, Indiana. The juvenile court issued a "PICK–UP AND DETAIN ORDER." (Appellants' App. 28).

On January 24, 2000, the juvenile court entered an amended dispositional order on the delinquency finding. In pertinent part, the court ordered:

that [A.W.] should be made a ward of the Montgomery County Division of Family and Children [DFC] and that she be placed at White's [Residential & Family Services (White's) ] Institute under the supervision of [DFC] as soon as arrangements can be made for her placement there.

\*   \*   \*   \*   \*   \*

The court further finds that the [DFC] should develop a plan for the eventual reunification of [A.W.] with either her mother or her father. In order to do that the DFC will be required to address the allegations that [A.W.] makes of sexual abuse and molestation, abuse and use of marijuana and alcohol and other drugs, and other issues dealing with her mother and her family and her father and his family. The plan should be based on the assessments made about what needs to be done in each family so that [A.W.] would have the opportunity to return to the home of either her mother or her father.

The court further finds that while [A.W.] is in placement at White's Institute she should continue with her educational needs .... [and] her parents should participate in any family counseling that is initiated by the staff at White's Institute, that [A.W.'s] parents should visit with [A.W.] at such times as visitation is permitted and they should maintain contact with her while she is in placement.

The court further finds that [A.W.'s] CASA, Jan Ranard, should also maintain contact with [A.W.] while she is in placement.

(Appellants' App. 32–33).

On June 20, 2000, the DFC issued a notice of a hearing on periodic review in the delinquency matter to determine "whether [A.W.] should remain in the care and custody of [DFC], or whether an alternative disposition should be made," (Appellants' App. 34), and set the matter for a hearing to be held on July 7, 2000.

Inexplicably, the caption on the notice in the delinquency proceeding contained A.W.'s name and the notation that the action was one for a Child Alleged to be in need of Services ("CHINS"), ostensibly transforming the proceeding from delinquency to CHINS.[2] The progress report in the delinquency matter filed by the DFC on July 3, 2000, included a summary of A.W.'s progress and the parents' role. The report noted that 1) Father had had no contact with A.W. at White's and had not participated in any services offered by White's, 2) Stepmother had telephoned to explain that she and Father would like a relationship with A.W. in the future, and 3) Mother had visited A.W. on two occasions, expressed her desire to see A.W. more often, and did not participate in any of the services offered by White's. Also, the report identified A.W. as manipulative and as having significant problems with truthfulness. The report partially corroborated Father's and A.W.'s siblings' statements that A.W. engaged in inappropriate sexual conduct with the siblings. In bold letters at the close of the DFC report in the

---

**2.** As noted *infra,* a CHINS petition was filed later; however, no such filing was in place at the time.

delinquency matter appeared the following:

The parents are advised that after July 1, 1999, a petition to terminate the parent-child relationship must be filed whenever a child has been removed from the child's parent and has been under the supervision of the county office of family and children for at least 15 of the most recent 22 months.

(Appellants' App. 38).

Also, for use at the delinquency hearing, White's filed a quarterly progress report for the period from April through July 2000. The report from White's detailed that A.W. was referred to White's initially in January 2000 based upon her problems as a runaway. The report noted that at first A.W. was placed in the sexual abuse program, but that in April 2000 she was transferred to the sexual offenders program based upon allegations made by her siblings. Also, in June 2000, A.W. was placed in White's substance abuse program. The report states, in part:

Initially, [A.W.] was not honest with the sexual allegations that were made against her, she is slowly admitting her wrong doings sexually as time progresses and she continues to participate in group and individual counseling. [A.W.] has admitted to kissing her brother and fondling his penis, but denies having sexual intercourse with him. [A.W.] admits to laying on top of her sister (clothed), rubbing/humping up and down on her and fondling her vagina over her clothes. [A.W.] will be given a poly-graph on July 5, 2000, to determine her honesty with these allegations. [A.W.] and I have discussed the importance of honesty in dealing with these allegations. [A.W.] has the tendency to not disclose everything that she has done initially and then reveals more information as time progresses.

[A.W.] has also discussed how she has been victimized by her own father. [A.W.] would like to be given questions on her poly-graph regarding the allegations she made towards her father as well. [A.W.] continues to state that her father has talked with her inappropriately in a sexual manner. She claims when he kissed her good-night, he would stick his tongue into her mouth and fondle her breast. [A.W.] states that her father has shared with her that he was teaching her about sex since no one else will. [A.W.] states she has used the same line with her brother and sister. [A.W.] stated that her father, step-mother, and aunt have exposed [her] to a lot of sexual conversations.

(Appellants' App. 48–49). The report noted that the polygraph examination would be administered on July 5, 2000.

Father appeared at the July 7, 2000 delinquency hearing with counsel. The results of the polygraph examination were not discussed during the hearing.

Subsequently, based upon A.W.'s allegations of sexual misconduct by Father, and A.W.'s admitted sexual misconduct with two of her siblings, in September 2000 the DFC filed a CHINS petition under cause number 54C01–0009–JC–188 (JC–188) alleging that Father and Stepmother's children, including A.W., were CHINS. The juvenile court held an initial hearing on JC–188 on November 6, 2000 as to all of the children except A.W. In explaining the allegations, the juvenile court stated:

The specific allegations that the [DFC] makes in addition to those general ones that the Court reviewed uh are that [A.W] is in placement at White's Residential Facility and the [DFC] has been ordered to supervise her. That ... she [is] no longer on probation, that her father has had inappropriate sexual contact and discussion with her. She's run

away from home on several occasions. All the children remain at home with [Father] who has sexually perpetrated his oldest daughter [A.W.]. That the allegations have previously been reported and investigated. [A.W.] has recently passed a polygraph test regarding allegations that her father's had inappropriate sexual contact with her and uh as well as regarding the fact that she's had, [A.W.] herself has had inappropriate sexual contact with her brother [E.] and her sister [R.]. Further that [A.W.] has been consistent in her allegations that her father's had inappropriate sexual contact with her when she was between the ages of twelve and thirteen. Other professionals believe that [A.W.'s] story is credible and uh the uh parents or father and step mother have refused to be interviewed to determine what services or actions may be appropriate for the family and essentially, apparently refuse to participate in any investigation.

(Tr. 51). Mother and Stepmother were named as parties in the CHINS proceeding. Father denied the allegations, and the court set the matter for a fact-finding hearing. At the close of the initial hearing in the CHINS proceeding, the following colloquy occurred:

MR. SIAMAS: Yes Your Honor.... I'm a bit confused by the record and I wonder if the Court can help clarify it. It's in regard to [A.W.]. I don't [know] if the Court has the, do you have a JD file 136?

COURT: No I only have this CHINS file.

MR. SIAMAS: Well I guess that's something that will just have to be investigated. The result of my confusion is that, that in a review which occurred in July the eighteenth in which parties were present. In that hearing the Court's order shows, the Review Order shows that [A.W.] is a child in need of services.... I guess if that is the case then I, ... obviously a child can't be a child in need of services twice I guess. At least shouldn't have, ... to do that. Um so if the Court doesn't have that file I don't think you can clarify that issue but either that order is mistaken in the wording or she's already a CHINS, I guess that's my question.

COURT: Well I'd have ... to look at it. My recollection is that she was made a CHINS for purposes of placement ... but it grows out of the delinquency proceeding. It doesn't grow out of ... CHINS proceedings.

MR. MCLEAN [Counsel for Father and Stepmother]: Judge I have the order in front of me and it simply says that ... [A.W.] continues to be a child in need of services and she will continue to be a ward of the [DFC] until further order of the Court. That refers to the Court's Dispositional Order of January in which the Court made her a ward of the DFC for purposes of providing services in connection with her juvenile delinquency and the activities that gave rise to that. I don't think the order can be construed as res judicata or collateral estoppel in this proceeding which the DFC itself has filed alleging that she's a CHINS.

COURT: Yeah that, that CHINS finding was not based on these allegations. So if the Division of Family and Children wants to pursue these allegations then that's, that's a different proceeding.

(Tr. 63–64).

On November 17, 2000, the DFC filed a notice of a Permanency Hearing in JD–136, the delinquency proceeding, set for December 11, 2000. On December 5, 2000, the DFC filed a progress report and other documents containing the circumstances leading to the proceedings and the matters to be determined at the permanency hear-

ing in the delinquency matter. In part, the report stated:

> [Father] has had no contact with our Department or White's. [Father] has not participated in any services. He continues to deny all allegations that have been substantiated against him. He has not been asked to participate in services at White[']s because at this time his contact with [A.W.] would not be beneficial. In light of the recent substantiation against [Father], services were offered to he (sic) and his family in the form of an Informal Adjustment. The family declined those services through their attorney.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [A.W.] continues to struggle with her own victimization and molest by her father. She especially struggles with the fact that she has taken responsibility for her actions and is working towards recovery and her father continues to deny any wrongdoing. It is apparent in group that [A.W.] struggles with her past molest and that it is very painful for her, especially since she feels that her father and his family have disowned her.

(Appellee's App. 22, 24).

A letter from one of A.W.'s counselors at a United Way agency, included in the materials filed by DFC on December 5, 2000 in the delinquency matter, noted that A.W. was not believed when she first made her allegations of abuse by Father. The letter also noted that A.W. had recanted her allegations that Mother and Mother's Boyfriend had used drugs. A.W. stated that she made the allegations because she was angry with her mother for attempting to hold A.W. accountable for her actions.

The December 5, 2000 materials filed by the DFC in the delinquency proceeding also included A.W.'s quarterly progress report from White's for the period from July through October. The report briefly mentioned A.W.'s feelings toward her father.

On December 11, 2000, Father and Stepmother filed their "Motion to Strike Document Filed December 5, 2000." (Appellant's App. 98). The motion to strike urged, inter alia, 1) that the DFC report contained allegations based upon inadmissible evidence, i.e., the lie-detector test; 2) that the allegations of sexual abuse are pending in JC–188, the CHINS proceeding, and that the DFC is attempting to "shoe-horn" the CHINS proceeding into the delinquency proceeding; and 3) that the document did not contain a "notice or claim of any wrongdoing on the part of [Father, Stepmother], or other members of their family." (Appellants' App. 98).

During the permanency hearing in the delinquency proceeding held on December 11, 2000, the juvenile court heard Father and Stepmother's motion to strike the documents submitted by the DFC. Father and Stepmother complained that the documents were "riddled with inadmissible evidence, hearsay, speculation, rumor, inadmissible vouching for credibility of witnesses, mention of a lie detector test.... It asks that [Father] be treated as a sex offender and be sent to sexual offender counseling." (Appellants' App. 190). In denying the motion to strike, the court noted that the January 2000 order placing A.W. at White's required:

> the Division of Family and Children to develop a plan for the eventual reunification of [A.W.] with either her mother or her father. The order says ... to do that the DFC will be required to address the allegations that ... [A.W.] makes of sexual abuse and molestation. Abuse and use of marijuana and alcohol and other drugs and other issues dealing with her mother and her family and her father and his family. In order for the Court to consider reunification of [the]

family which is what the Court's obliged to do under the law, the Court feels obligated to look into these allegations. To determine whether there's substance to them or not, to address them if there is in order to resolve whatever the problems might be to look at reunification. And the Court believes that given that job to do it's perfectly relevant and material information that these allegation are addressed in the report and part of the problem is that they're not substantiated one way or the other. But yet they're there and a lot of the behaviors that [A.W.] exhibited are typical of a person who's been molested. So there's a reason to look at these allegations, there's reason to take them seriously ... And there's no other way to get at what has to happen other than to go forward in this kind of proceeding. As far as the Court's concerned it doesn't matter whether the CHINS Petition [in JC–188] has been filed or not. The issues are on the table. Sometimes we get to them by a CHINS proceeding, sometimes we get to them through a delinquency proceeding when we look at what the behavior of the child is telling us about what else has happened to the child. So I don't see that there's anything out of line, illegal, or wrong about the report and the information that's in it. And, and I think that we need to go forward on the basis of the report. So the Motion to Strike will be denied.

(Appellants' App. 192–93).

A.W.'s caseworker, Mandi Allen, testified at the permanency hearing in the delinquency proceeding. Over Father's objection, Allen testified that A.W. had passed a lie-detector test with regard to her allegations and that the "investigation continued and allegations were substantiated against [A.W.] for perpetrating her siblings and against [Father] for perpetrating [A.W.]." (Appellants' App. 196). Allen also explained that A.W. was making progress in her education and treatment, except with regard to Father's continual denial of the allegations, and the fact that Father had not participated in any of A.W.'s treatment at White's. Allen testified that Mother and Mother's Boyfriend had been participating in treatment sessions with A.W. and that the DFC recommended continuation of those sessions with the goal of reunification of A.W. with Mother by June 2001.

Allen testified further that the DFC recommended that Father and Stepmother participate in the assessments offered by Families United, and in treatment only if the assessments indicated the need for such. When Allen was asked specifically whether Father would receive sexual perpetrator counseling, Allen responded that he would if the assessment indicated that he was a sexual perpetrator.

On December 28, 2000, the juvenile court issued its permanency plan order in JD–136, the delinquency proceeding. The permanency plan set out A.W.'s placement, educational needs, counseling needs, and other matters required by statute. The permanency plan also included the following:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that [Father and Stepmother] shall obtain assessments through Families United and follow services [sic] recommended by Families [U]nited and they shall have immunity from any prosecution in any criminal or juvenile court proceeding with regard to anything they say during the assessment and services, and they shall cooperate with White's Institute....

(Appellants' App. 106).

### DECISION

Implicit in the court's order is a finding that the sexual abuse alleged by A.W. was

substantiated. The juvenile court's order is phrased in the imperative. The order directs Father and Stepmother to participate in assessments and any counseling deemed necessary after the assessments. As distilled, Father and Stepmother's arguments are that the juvenile court in the delinquency proceedings did not follow the proper statutory procedures and denied them due process when it entered the permanent dispositional order. We agree.

■ A juvenile court in delinquency proceedings has the authority to order parents and guardians to participate in a child's treatment. The proceedings in JD–136 were commenced as delinquency proceedings, and A.W. was adjudicated a delinquent child. A parent or guardian "may be required to participate in a program of care, treatment, or rehabilitation for" a child adjudicated a delinquent child. Ind. Code § 31–37–12–6.

Separate but identical statutes referring to delinquency and CHINS proceedings, I.C. § 31–37–15–1 and I.C. § 31–34–16–1 respectively, outline the procedure for filing a petition with the juvenile court to require the participation of a parent, guardian, or custodian. The filing of a petition for parental participation places the parent on notice that the court may make an adjudication affecting the parent. The record of proceedings does not reveal that a petition for parental participation was filed in the present case.

After a determination that a child is a delinquent child, "the juvenile court shall order a probation officer or a caseworker to prepare a predispositional report that contains a: (1) statement of the needs of the child for care, treatment, rehabilitation, or placement; and (2) recommendation for the care, treatment, rehabilitation, or placement of the child." I.C. § 31–37–17–1. Parents may prepare an alternative report for the court's consideration. *Id.*

Although initially A.W.'s allegations were not believed, the juvenile court's January 2000 dispositional order required the DFC to ·investigate A.W.'s allegations of "sexual abuse and molestation" by Father, and alcohol and drug abuse by Mother in conjunction with the plan for A.W.'s reunification with one of her parents. (Appellants' App. 32). The July 2000 predispositional report in the delinquency proceeding contained White's report that A.W. admitted abusing E. and R. and would be given a polygraph examination to determine her truthfulness regarding her abuse of her siblings and her consistent allegations of abuse by Father. After the investigation, the DFC deemed A.W.'s allegations reliable. Thereafter, the reports to the juvenile court indicated that the DFC deemed the allegations substantiated.

■ During the proceedings, it became evident that the goals and interests of A.W. and those of Father and Stepmother could conflict. Because such conflicts occur, Title 31 has addressed the due process rights of parents or those accused of wrongful conduct in several contexts, including when parents are ordered to participate in a treatment program. *See A.E.B. v. State,* 756 N.E.2d 536, 543 (Ind. Ct.App.2001) (statutory procedures must be followed before a juvenile court can order parental participation). I.C. § 31–32–2–3 provides:

(a) This section applies to the following proceedings:

(1) Proceedings to determine whether a child is a child in need of services.

(2) Proceedings to determine whether the parent, guardian, or custodian of a child should participate in a program of care, treatment, or rehabilitation for the child.

(3) Proceedings to determine whether the parent or guardian of the estate of a child should be held financially re-

sponsible for any services provided to the parent or guardian or the child of the parent or guardian.

(4) Proceedings to terminate the parent-child relationship.

(b) A parent, guardian, or custodian is entitled:

(1) to cross-examine witnesses;

(2) to obtain witnesses or tangible evidence by compulsory process; and

(3) to introduce evidence on behalf of the parent, guardian, or custodian.

In the present case, Father and Stepmother were without notice that the complexion of the allegations of abuse had altered. Moreover, they were not allowed the statutory due process required as to the allegations leading to the parental participation order. They were not parties to or informed of the polygraph, and they could not properly and effectively cross-examine the witnesses who filed reports stating that A.W.'s allegations of sexual abuse were credible and substantiated.

The problem may be exacerbated by other portions of Title 31. For instance, "[a]ny predispositional report may be admitted into evidence to the extent that the report contains evidence of probative value even if the report would otherwise be excluded." I.C. § 31–37–18–2; *see also* I.C. § 31–37–14–3 (the burden of proof for findings in delinquency proceedings, other than termination of parental rights and whether the child committed acts constituting delinquency, is proof by a preponderance of the evidence). Here, the testimony at the permanent disposition hearing regarding the DFC's conclusion that the allegations of sexual abuse were substantiated was based upon Allen's conversations with others, reports by others, and a polygraph examination. No evidence was presented as to the circumstances of the polygraph, and no information regarding the polygraph was disclosed to Father and Stepmother. A.W. did not testify as to the

sexual abuse allegations at the hearing. Here, all of the evidence to substantiate the allegations was facially inadmissible. However, because the delinquency proceedings appear to allow as evidence reports that contain information that would be otherwise inadmissible, serious due process concerns arise when the allegations constitute criminal conduct or conduct impairing parental rights. *Cf. A.P v. Porter Co. Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000) (within the context of proceedings to terminate parental rights, three distinct factors encompassed within due process: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure.").

Pursuant to the juvenile delinquency statutes, once the juvenile court was presented with the conclusions of the DFC's investigation, the juvenile court had authority to require the participation of the parents in A.W.'s treatment. The juvenile court's dispositional decree shall be accompanied by "written findings and conclusions upon the record concerning ... (1)[t]he needs of the child for care, treatment, rehabilitation, or placement, [and] (2)[t]he need for participation by the parent, guardian, or custodian in the plan of care for the child." I.C. § 31–37–18–9. However, the court's authority to require parental participation is tempered by the statutory due process considerations.

We conclude that under the circumstances presented herein, Father and Stepmother were not accorded the due process procedures specified within Title 31. In fact, the matter was not litigated in any meaningful sense before the court in the juvenile delinquency permanency proceeding implicitly accepted the DFC's allegations that the abuse was substantiated

and ordered Father and Stepmother to comply with services at Families United.

In the delinquency proceedings, Father and Stepmother were not apprised of the allegations made against them in a clear and concise manner, even though various reports have alluded to the allegations since 1999. The record on appeal does not reveal that matters surrounding A.W.'s polygraph examination were disclosed to Father and Stepmother in a manner that would allow them to prepare any defense or rebuttal they may have to the allegations. *See Maybaum v. Putnam Co. Office of Family & Children,* 723 N.E.2d 951, 956 (Ind.Ct.App.2000) (even proceeding under different section of CHINS statute than originally alleged failed to apprise parents of the DFC's claim and allow them to prepare defense); *see also* I.C. § 31–32–2–3 (parents are entitled to "cross-examine witnesses … to obtain witnesses or tangible evidence by compulsory process, … [and] to introduce evidence on [their] behalf.").

Weighing the risk of error against the private interests in not proceeding without the due process safeguards and the lack of reasoning for proceeding absent the safeguards, the result is evident: by directing Father and Stepmother to participate in assessments and possibly counseling that could lead to revelation of criminal matters without the attendant statutory safeguards, the juvenile court's order violated Father and Stepmother's due process rights.

Accordingly, the portion of the permanent dispositional order in the juvenile delinquency proceeding that requires Father and Stepmother to seek assessments and any recommended counseling is in error.[3] The cause is remanded for entry of a

permanent dispositional order consistent with this decision.

Reversed and remanded.

MATHIAS, J., and VAIDIK, J., concur.

---

3. The portion of the dispositional order of which Father and Stepmother complain also contains a purported grant of immunity. A trial court cannot compel immunity. *Reed v. State,* 748 N.E.2d 381, 390 (Ind.2001). However, we will not address immunity inasmuch as our decision reversing that portion of the order obviates the need for further discussion.