

## IN THE
# Court of Appeals of Indiana

In Re: the Matter of K.W., A Child Alleged to Be a Delinquent Child,

C.A. (Mother),

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Nov 20 2024, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

November 20, 2024

Court of Appeals Case No.
23A-JV-2040

Appeal from the Lawrence Circuit Court

The Honorable Nathan G. Nikirk, Judge

The Honorable Anah Hewetson Gouty, Juvenile Referee

Trial Court Cause No.
47C01-2208-JD-300

---

**Opinion by Judge May**
Judges Vaidik and Kenworthy concur.

**May, Judge.**

[1] "[A]lternatives like problem-solving courts . . . are invaluable tools for rehabilitating drug offenders and reducing recidivism. These courts address the unique needs of eligible offenders, often allowing them to remain in their communities while taking part in intensive treatment programs under direct court supervision." *Kellams v. State*, 198 N.E.3d 375, 375-6 (Ind. 2022) (Rush, C.J., dissenting from denial of transfer). However, the non-adversarial nature of problem-solving courts – which involve informal cooperation between parties and the court – can create "tension with participants' due process rights." William G. Meyer (Ret.), The Drug Court Judicial Bench Book 163 (Nat. Drug Ct. Institute 2011). That tension is the focus of this appeal.

[2] The Lawrence Circuit Court ordered C.A. ("Mother") to participate in juvenile problem-solving court ("JPSC") with her son, K.W., who had been adjudicated a delinquent. After Mother allegedly failed to comply with several of the JPSC's orders, the JPSC ordered Mother to spend multiple weekends in jail and placed her on house arrest with electronic monitoring, and it entered those orders depriving her of her liberty without the State providing the process due to someone alleged to be in indirect contempt of court. Mother asks us to declare the JPSC's orders violated her right to due process.

[3] The State argues we should dismiss Mother's appeal as moot because the JPSC removed Mother from house arrest, vacated its most recent order for Mother's imprisonment, and appointed counsel to assist Mother with the formal petition for contempt that the State thereafter filed. We address Mother's appeal on its

merits under Indiana's public interest exception to the mootness doctrine and hold:

> (1) the statutes that created problem-solving courts did not give the JPSC the authority to deprive Mother of her liberty;

> (2) the JPSC failed to provide the process due to someone alleged to have committed indirect contempt of court; and

> (3) the JPSC failed to obtain knowing waiver of those due process rights.

As the JPSC neither obtained a valid waiver of Mother's rights nor provided the process due to a person alleged to have committed indirect contempt of court, we reverse the JPSC's orders placing Mother on house arrest and ordering her to spend time in jail.

## Facts and Procedural History

[4] In August of 2022, fourteen-year-old K.W. lived in Mitchell, Indiana, with his maternal grandmother, C.D. ("Grandmother"), who was his legal guardian. Mother lived in Bedford but had "regular contact" with K.W.[1] (Appellant's App. (hereinafter "App.") Vol. 2 at 36.) K.W. was serving supervised probation through the Perry Circuit Court following his July 2022 adjudication

---

[1] K.W.'s father is named in the delinquency petition and attended the initial hearing, but he is absent from the proceedings thereafter.

as a delinquent for committing two acts in April 2022 that would be auto theft if committed by an adult.[2]

[5]   On August 25, 2022, in Lawrence County, K.W. stole a gun from Billy Thedford, threatened Mother while holding the gun, pointed the gun at Mother, attempted to take Mother's car, stole Thedford's truck, and drank alcohol as he drove around in Thedford's truck.  On August 29, 2022, the State initiated the Lawrence County proceedings from which Mother appeals by filing a petition alleging K.W. was a delinquent child for committing acts that constituted Class A misdemeanor dangerous possession of a firearm[3] by a teenager and that would be, if committed by an adult, Level 3 felony attempted armed robbery,[4] Level 5 felony theft of a motor vehicle with a prior adjudication of motor vehicle theft,[5] Level 5 felony intimidation,[6] Level 6 felony pointing a firearm,[7] and Level 5 felony theft of a firearm.[8]  K.W. admitted committing theft of Thedford's motor vehicle while having a prior delinquency adjudication for

---

[2] The Perry County Case Numbers were 62C01-2204-JD-000097 and 62C01-2204-JD-000100.

[3] Ind. Code § 35-47-10-5.

[4] Ind. Code § 35-42-5-1.

[5] Ind. Code § 35-43-4-2.

[6] Ind. Code § 35-43-2-1(a) & (b)(2)(A).

[7] Ind. Code § 35-47-4-3.

[8] Ind. Code § 35-43-4-2(3).

theft of a vehicle, and the Circuit Court adjudicated him a delinquent. The Circuit Court also referred K.W. to the Dual Status Assessment Team.[9]

[6] On October 24, 2022, the Lawrence County Probation Department filed its Predispositional Report regarding K.W., who, by this time, had turned fifteen years old. A probation officer reported that K.W. needed "intensive services through a Qualified Residential Treatment Program to address his needs" and the officer did "not believe the juvenile has the adequate support to be successful in the Juvenile Problem Solving Court at this time." (App. Vol. 2 at 39.) Grandmother and Mother also agreed that a Qualified Residential Treatment Program would be the appropriate placement for K.W. (*See* App. Vol. 2 at 31, 39.) The Circuit Court nevertheless ordered K.W., Mother, and Grandmother to participate in the JPSC. (*See* App. Vol. 2 at 43, 44.)

[7] The Circuit Court's order regarding Mother provided:

> The above named child has been ordered to participate in the Lawrence County Juvenile Problem Solving Court. As the parent/guardian of the juvenile, [Mother], you are ordered to

---

[9] A Dual Status Assessment Team is "a committee assembled and convened by a juvenile court to recommend the proper course for a dual status child." Ind. Code § 31-41-1-5. A dual status child is, generally speaking, a child who is or has been adjudicated as both a child in need of services and a juvenile delinquent. *See* Ind. Code § 31-41-1-2 (providing six definitions of dual status child). On August 29, 2022, the probation department filed a "Dual Status Screening Tool Report" (App. Vol. 2 at 3), which prompted the Circuit Court to refer K.W. to the Dual Status Assessment Team on the same day. The State filed notice on September 1, 2022, of a "Dual Status Team Assessment." (*Id*. at 5.) We have not located a report from the Dual Status Assessment Team in the record. The record does, however, contain multiple references to Mother's continued engagement with DCS throughout these juvenile proceedings. (*See* Tr. Vol. 2 at 74, 75, and 93; Appellant's App. Vol. 2 at 32, 33, 34, 35, 39, 108.) Nevertheless, inexplicably, the Modified Dispositional Order for K.W. entered on August 30, 2023, indicates "[K.W.] has not been identified as a dual status child." (App. Vol. 2 at 105.)

participate and cooperate fully with program staff and comply with all requirements of the Lawrence County Juvenile Problem Solving Court. Specifically, the parent, guardian or custodian shall:

1.  Provide specified care and supervision for the child

2.  Be aware of the child's whereabouts at all times; specifically, parents are responsible for knowing the who, what, when, and where of their child

3.  Ensure the child abide by his/her court ordered curfew

4.  Cooperate with court officials including attending court hearings and probation meetings each week as directed

5.  Maintain open/honest communication with court and probation officer/providers in the program

6.  Will not verbally or non-verbally bad mouth or undermine providers, probation officer, team representatives, or the court in front of the teen

7.  Ensure that the child's case plan objectives are completed weekly as directed

8.  Ensure that the child attends all of his/her treatment and services; which may include but are not limited to: individual counseling, family counseling, recovery works, and home-based case management services

9.  Ensure the child associate with a positive peer group

10. Ensure the child attend a pro-social activity weekly (Ex. youth group; sporting activities; extra-curricular; employment if age eligible; any approved positive activity)

11. Not allow any alcohol or illegal drugs at their residence

12. Not consume any alcohol or be under the influence of alcohol in the presence of the juvenile

13. Not use any illegal substances and remain substance free

14. Ensure the child take their prescription medication as prescribed

15. Ensure all medication, including prescription and non-prescription, is secured and not accessible to the child

16. Submit to a breathalyzer or chemical test upon the request of the probation officer, all screens must be negative

17. Ensure the child attend school daily or actively participate in GED classes

18. Monitor the child's school daily; monitor academics; verify assignments are completed timely and document same; if applicable contact GED instructor weekly and document same

19. Allow treatment and court officials to visit their residence

20. Complete whatever documentation that the court deems necessary

21. Pay all program fees and associated costs per payment schedule set up by Case Manager

22. Complete weekly job search if not employed; obtain employment within 60 days

23. Comply with all conditions as outlined in the Terms of [sic] Conditions of Juvenile Problem-Solving Court

**Failure to cooperate with program requirements will subject you to program sanctions and/or contempt proceedings.**

(App. Vol. 2 at 43) (emphasis added).

[8]     The Terms and Conditions of Participation in the JPSC provided the following with regard to parents who were participating in the program:

7.      Participants and Parents are required to sign a General Consent for Release of Confidential Information authorizing the Juvenile Problem-Solving Court team to discuss matters concerning participation in the Juvenile Problem-Solving Court.

\* \* \* \* \*

9.      Parents of the participant will be ordered to comply and adhere to the Parental Order. Failure to do so may result in sanctions being applied to the parent by the Juvenile Problem-Solving Court Juvenile Referee.

\* \* \* \* \*

16.    Participants/parents must notify the Juvenile Problem-Solving Court Case Manager within 24 hours of any change of address, telephone and/or employment. A working telephone must be maintained with answering machine or voice mail. Cell phones are an acceptable alternative. Failure to do so may result in sanctions against the participant by the Problem-Solving Court Juvenile Referee.

* * * * *

18.    . . . Parents must know the who, what, when, and where of the participant at all times. Failure to do so may result in sanctions against the participant and/or parent by the Juvenile Problem-Solving Court Juvenile Referee.

* * * * *

23.    Incentives, Sanctions, and Therapeutic Adjustments will be administered by the Juvenile Problem-Solving Court Juvenile Referee and may be based upon the recommendations from the Juvenile Problem-Solving Court Team. . . . Parents in compliance can receive a ticket for the monthly drawing for a gift card. . . . The range of sanctions for parents include verbal warnings from the case manager, team members, and/or the Juvenile Referee, community service, electronic monitoring, and if necessary, jail. Therapeutic adjustments can include substance abuse assessments, mental health referrals, changes in the treatment plan or programming, placement at Logansport/Madison Diagnostic Center, Residential Placement/Treatment facility, increased attendance in support meetings, changes in medication, thinking reports, apology letters, and attendance at Victim Impact Panels. The Case Manager shall record all incentives, sanctions and therapeutic adjustments issued in the participant's record.

(App. Vol. 2 at 47-9.)

[9] The JPSC's Status Order for the week ending November 29, 2022, indicated Mother was in compliance with the terms and conditions of the program. For the week ending December 6, 2022, the JPSC ordered Mother "to ensure [K.W.] is completing three missing assignments per day and also does not game or have his cell phone." (App. Vol. 2 at 54.) At status hearings during the next two months, the court found Mother in compliance with the terms and conditions of the program.

[10] On February 13, 2023, the Probation Department filed a request for K.W. to be taken into custody because K.W. had violated curfew twice, been "whereabouts . . . unknown" twice while on house arrest, broke into Grandmother's garage, and stole a handgun from the garage. (App. Vol. 2 at 61.) The JPSC ordered K.W. taken into custody "to protect the child or the community" and detained at the Southwest Indiana Regional Youth Village (hereafter "Youth Village"). (App. Vol. 2 at 62.) On February 14, 2023, the Circuit Court held a formal hearing regarding K.W.'s detention, and on February 16, 2023, the Probation Department filed a petition to modify K.W.'s probation.

[11] On February 21, 2023, the Circuit Court held a detention hearing and then released K.W. to the custody of Mother[10] and placed him on home detention

_____

[10] A transcript of the hearing that occurred on February 21, 2023, has not been provided on appeal. Nor does the remaining Record clarify why K.W. was released into the custody to Mother, rather than to

with electronic monitoring. The JPSC also ordered Mother to participate with Youth Village, to contact "NLCS[,]"[11] and "to keep all medications secured and locked away." (App. Vol. 2 at 67.) The JPSC held a status hearing on February 28, 2023, and awarded Mother an incentive for participating in the program. (App. Vol. 2 at 12.)

[12] In the Status Order for the two weeks ending March 14, 2023, the JPSC found both K.W. and Mother in compliance with the terms and conditions of the program. The JPSC ordered "Family Preservation Services"[12] be offered to K.W. and Mother "immediately." (App. Vol. 2 at 69.)

[13] On March 28, 2023, K.W. admitted the allegations in the petition to modify probation that had been filed on February 16, 2023. The Circuit Court ordered the Probation Department to file a Modification Report. Following a dispositional hearing, the Circuit Court continued the prior dispositional order, which kept K.W. and Mother in the JPSC program.

---

Grandmother, who was his legal guardian. However, from this point forward, the reports and orders of the JPSC do not address Grandmother, with the exception of a note indicating she attended the status hearing on August 28, 2023.

[11] We infer this is a reference to North Lawrence Community Schools, which is the school district in Bedford, where Mother lives. (App. Vol. 2 at 33 (Mother's address).) K.W. had been attending Mitchell Community Schools while living with Grandmother in Mitchell. (App. Vol. 2 at 30 (K.W.'s address with Grandmother), at 35 (Grandmother's address), at 36 (school enrollment).) As K.W. appears to have returned to Mother's custody, she would need to enroll him in NLCS.

[12] Family Preservation Services is a coordinated set of services – including 24-hour crisis intervention, case management, in-home skill building and counseling, and after-care – that can be provided to families with a child at imminent risk of being placed outside the home. *See* Ind. Code ch. 31-26-5.

[14] On April 4, 2023, the JPSC held a status hearing and found Mother was "not in compliance with the Terms and Conditions of the JPSC due to police contact for alleged trespass and failing to send proof of [K.W.]'s home chores to [Probation Officer] Bridges as directed." (App. Vol. 2 at 71.) The JPSC ordered Mother to serve eight hours of community service and complete "MRT"[13] through the Probation Department. (App. Vol. 2 at 71.)

[15] On April 11, 2023, the JPSC found Mother was not in compliance because she allowed K.W. to violate curfew and failed to email pictures to prove K.W. was completing chores at home. The JPSC ordered Mother to check K.W.'s school assignment records electronically via an online program at least twice a week and to perform sixteen additional hours of community service by April 28, 2023. The JPSC also ordered Mother to produce a Thinking Report about her goals for K.W.'s delinquency case.

[16] The JPSC's status report for the week ending April 18, 2023, found Mother in compliance and indicated she should "receive an incentive." (App. Vol. 2 at 74.) The JPSC also ordered Mother to ensure K.W.'s homework folder was going to and from school each day. One week later, the JPSC found Mother not in compliance because she was failing to check that K.W.'s homework was

---

[13] MRT is a re-occurring class taught by K.W.'s probation officer. (*See* Tr. Vol. 2 at 41.) According to the Indiana Department of Correction's website, "Moral Reconation Therapy" is a cognitive behavioral class that teaches problem solving and decision-making skills. *See* IDOC: Programs, Treatments & Services Overview, https://www.in.gov/idoc/facilities/re-entry/community-correction/program-treatment-and-services-overview/ [https://perma.cc/4MVM-28J7].

completed and she still had twenty-four hours of community service to complete. The JPSC ordered Mother to contact the school daily to ensure K.W. was completing homework.

[17] Two weeks later, on May 10, 2023, the JPSC found Mother was not in compliance with the program due to failing to make K.W. complete homework, not emailing updates to K.W.'s probation officer, missing a service-provider appointment, not arriving for MRT class, and failing to complete community service. The JPSC ordered Mother to "serve a total of 96 hours (4 actual days) in the Lawrence County Jail[.]" (App. Vol. 2 at 76.) Mother was to serve forty-eight hours on each of the weekends of May 12 and May 19.

[18] On May 17, 2023, after Mother had served one weekend in jail, the JPSC entered an amended order that indicated Mother's second weekend was "suspended pending [Mother]'s compliance with the Terms and Conditions and Parental Order[.]" (App. Vol. 2 at 79.) At a hearing on May 18, the JPSC found Mother in compliance with the program and noted "Mother's remaining 48-hour jail sentence remains SUSPENDED." (App. Vol. 2 at 80) (emphasis in original).

[19] On June 6, 2023, the JPSC found Mother not in compliance because she again had missed MRT and ordered Mother to get a medical excuse for the missed session of MRT. On June 13, 2023, the JPSC found Mother not in compliance because she missed a third MRT session without medical excuse, and the JPSC

ordered Mother to execute the suspended forty-eight-hour sanction in the Lawrence County Jail beginning on June 16, 2023.

[20] On June 20, 2023, the JPSC found Mother in compliance because she was working on parenting goals. The JPSC also found Mother in compliance on June 27, July 18, and August 1, 2023. On August 8, the JPSC held a status hearing but entered no findings or order regarding Mother. On August 9, 2023, the Lawrence County Probation Department petitioned to modify K.W.'s probation because he again violated probation by allegedly committing two counts of resisting law enforcement on July 27, 2023.

[21] On August 15, 2023, the JPSC found Mother "not in compliance" because of one positive drug screen and other refused drug screens. (App. Vol. 2 at 90.) The positive drug screen was for methamphetamine and was confirmed with a lab test. Mother challenged the validity of the positive test. The JPSC ordered Mother to complete a substance use assessment and follow any recommendations, to complete all outstanding community service within two weeks, and to be placed on home detention with electronic monitoring.

[22] On August 22, 2023, the Circuit Court held the initial hearing on K.W.'s new delinquency petition, which alleged two counts of what would be Class A misdemeanor resisting law enforcement if committed by an adult, and the petition to modify his probation that was filed based thereon. K.W. denied the allegation, and the Circuit Court set the matters for pre-trial conference.

[23]     That same day, the JPSC held a status hearing. The JPSC found Mother not in compliance because she again tested positive for methamphetamine and because she placed disparaging posts about the JPSC on Facebook.[14] (*See* Tr. Vol. 2 at 93-101.) As a result, the JPSC entered an order for Mother to be "committed to the Lawrence County Jail for violating the rules of the Juvenile Problem Solving Court." (App. Vol. 2 at 93.) The order indicated Mother was to serve her two-day sanction from August 25 to 27. Mother later filed notice that she did not have anyone to supervise K.W. from August 25 to 27, so the JPSC postponed Mother's two-day incarceration to September 1, 2023. (App. Vol. 2 at 97, 98.)

[24]     On August 29, 2023, the Circuit Court held a hearing on the State's new delinquency petition for K.W., and counsel appeared for K.W. at that hearing. The JPSC held a status hearing immediately thereafter, during which K.W.'s counsel argued:

---

[14] Mother allegedly placed the following posts on social media on August 15, 2023:

  1. "I fucking hate this God damn country. Fuck the problem solving court. She is doing her shit again. I'm moving outta this fucking country."

  2. "I would love to know what is going on in court court system. My son is on problem solving court they gave me a drug screen I failed for acetaminophen so they sent it off. I was told a few days later they tell me it was negative then dcs is showing up at my house saying I failed for meth (I've been clean for 1 year and 5 months) I passed there test. But Ashley called and reported it that I failed for meth 2 and a half weeks earlier. Today I go to court for son in problem solving court and they put me on house arrest. So I'm getting in trouble bc this bitch has it in for me and wants my kids removed again. She needs to get over wtf her problem is. I'm ready to take down lawrence county."

(App. Vol. 2 at 108) (errors in original).

> Judge, if I might make a request. I would ask that [Mother's] electronic monitoring, which is also in Indiana's law considered to be incarceration as a deprivation of her liberty, that that be stayed pending a status hearing or her opportunity to be availed of her Constitutional rights by counsel in a hearing.
>
> The order placing her on electronic monitoring and its subsequent order regarding her incarceration I believe need to be looked over by an attorney. And I believe that while she's incarcerated, even on electronic monitoring house arrest, that she, without having had counsel present, the opportunity to review the issues with counsel, I think I'd [sic] be appropriate to stay that. To let her off electronic monitoring pending review and potential appeal.

(Tr. Vol. 2 at 125.) The trial court responded:

> Here's what I think. I think she's subject to a parental order. It was issued months ago and it's very clear what her obligations are. And I am appointing her counsel. I am going to suspend the jail sentence for Friday through Sunday. I know you're appointed to represent [K.W.] so you can't represent [Mother]. She's asked for counsel. I've appointed counsel.

(Tr. Vol. 2 at 125.) After Mother explained that house arrest was a hardship because she had been unable to work her three gig jobs or get groceries for her children, the JPSC agreed Mother could report to community corrections every morning for a drug screen in lieu of house arrest.

[25] Thereafter, the JPSC entered a Status Order that explained:

The Court conducted a separate Modification hearing for [K.W.] in this case. It was an adversarial hearing and [K.W.] was present with counsel, Timothy Sledd.

The Court Orders [K.W.] released from home detention with electronic monitoring and reminded of curfew and his obligation to attend school daily.

[Mother] is not in compliance with the Terms and Conditions of Juvenile Problem-Solving Court and the Parental Order dated November 2, 2022. The [JPSC] reviewed with [Mother] previously presented evidence and testimony covered in the August 22, 2023 status hearing due to [Mother]'s raised concerns in [K.W.]'s Modification hearing. On August 22, 2023, [Mother] had the opportunity to be heard regarding the alleged violations in failing to refrain from the use of illegal substances (methamphetamine) and failing to ensure [K.W.] attended school.

The [JPSC] appoints the Lawrence County Public Defender Agency to represent Mother[.]

ALSO, The [JPSC] stays the imposed sanction and Second Amended Commitment Order dated August 25, 2023. The [JPSC] vacates the house arrest Order for Mother and Orders Mother to report daily to Community Corrections and screen daily. Mother shall report to her Lawrence County Community Corrections officer after she drops [K.W.] to school (Monday through Friday), around 8:00 a.m. to 8:30 a.m. and she shall submit to a drug screen each morning.

(App. Vol. 2 at 99.)

On August 30, 2023, following K.W.'s admission that he resisted law enforcement, the Circuit Court ordered K.W. placed in a residential treatment program. (App. Vol. at 104-6.) On September 1, 2023, counsel for Mother entered an appearance and filed a notice of appeal from the JPSC's status orders of August 15, 2023, and August 22, 2023, which respectively had ordered Mother to serve home detention with electronic monitoring and to serve two days in jail.

## Discussion and Decision

Mother claims the JPSC's orders that she "be placed on indeterminate house arrest and . . . be incarcerated in the Lawrence County [J]ail . . . deprive[d] her of her liberty" without due process. (Appellant's Br. at 13.) Before we address the merits of Mother's argument, however, we must address the argument raised by the State on cross-appeal.

The State argues we should dismiss Mother's appeal because: "[Mother]'s sanctions have already been served or vacated and she has been appointed counsel to represent her in any further matters." (Appellee's Br. at 7-8.) Thus, says the State, Mother's appeal is moot.

> A case is moot when the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief. *T.W.* [*v. St. Vincent Hosp. & Health Care Ctr., Inc.*], 121 N.E.3d [1039,] 1042 [(Ind. 2019), *reh'g denied*]. But "Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur." *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991).

*E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022). Addressing the merits of moot cases "is especially appropriate in appeals that address novel issues, present a close case, or develop case law on a complicated topic." *Id.* at 467 (internal citations omitted).

[29] The issue herein – whether the JPSC can order jail time or house arrest for the parent of a juvenile delinquent without providing written notice of the allegations or the assistance of counsel – is an issue that has not been addressed by Indiana's appellate courts and could recur. *See In re Marriage of Stariha*, 509 N.E.2d 1117, 1123 (Ind. Ct. App. 1987) (holding question of whether father was denied due process when he was jailed for thirty days for indirect contempt without being informed of his right to counsel at the hearing was of great public importance, likely to recur, and likely to continue to evade review). The issue is also, as shall become more apparent below, "a complicated topic." *E.F.*, 188 N.E.3d at 467. We accordingly choose to address the merits of the issue Mother presents. *See, e.g.*, *J.B. v. State*, 55 N.E.3d 831, 832-33 (Ind. Ct. App. 2016) (addressing whether juvenile court could reduce a restitution order to a civil judgment, despite juvenile court's revocation of its own order during the appeal proceedings, because no published appellate opinion had yet addressed the issue, which could recur).

[30] Turning toward the merits of Mother's claim, we note the State does not challenge her argument. Instead, the State concedes: "Whether through the statutes regulating problem-solving courts or indirect-contempt proceedings, Mother was entitled to notice of her alleged violated [sic] and to the

representation of counsel at her contempt proceedings." (Appellee's Br. at 9.) While we sometimes accept concessions from the State regarding factual matters, "a question of law . . . is a matter for the courts, not the State, to decide." *Hochstetler v. State*, 215 N.E.3d 365, 371 (Ind. Ct. App. 2023), *reh'g denied*. "Were we to accept a concession as dispositive of an issue, we would effectively abdicate our judicial function in favor of a party." *Gardner v. State*, 591 N.E.2d 592, 593 (Ind. Ct. App. 1992). As when an appellee chooses not to address the merits of an issue raised by an appellant, we will review the conceded issue for prima facie error. *See Matter of Paternity of B.Y.*, 159 N.E.3d 575, 578 (Ind. 2020) (reviewing for prima facie error when father failed to file any appellate response to mother's arguments). "Prima facie error in this context means 'at first sight, on first appearance, or on the face of it.'" *Salyer v. Washington Regular Baptist Church Cemetery*, 141 N.E.3d 384, 386 (Ind. 2020) (quoting *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014)). With these preliminary matters resolved, we explore the general structure of problem-solving courts.

[31] Our legislature defined a problem-solving court as

> a court providing a process for immediate and highly structured judicial intervention for eligible individuals that incorporates the following problem solving concepts:
>
> (1) Enhanced information to improve decision making.
>
> (2) Engaging the community to assist with problem solving.

(3) Collaboration with social service providers and other
stakeholders.

(4) Linking participants with community services based on risk
and needs.

(5) Participant accountability.

(6) Evaluating the effectiveness of operations continuously.

Ind. Code § 33-23-16-8. Problem-solving courts may be established by city
courts or county courts, either as one of eight designated types of problem-
solving court[15] or by receiving certification from the office of judicial
administration pursuant to Indiana Code section 33-23-16-17. Ind. Code § 33-
23-16-11.

[32] Problem-solving courts and the services thereof "are available only to
individuals over whom the court that established the problem solving court has
jurisdiction." Ind. Code § 33-23-16-12. Nevertheless, there are multiple
avenues by which individuals can arrive in one of Indiana's problem-solving
courts – for example, as part of a pre-trial diversion program, as a condition of
probation or parole, as a condition of a misdemeanor sentence, pursuant to a
dispositional decree for a child adjudicated a child in need of services

---

[15] Those eight types include a drug court, a mental health court, a family dependency drug court, a
community court, a reentry court, a domestic violence court, a veterans' court, or a safe baby court. Ind.
Code § 33-23-16-11.

("CHINS"), or as a "condition of an informal adjustment program" during delinquency or CHINS proceedings. Ind. Code § 33-23-16-13; *see also* Ind. Code §§ 33-23-16-14 (addressing placement in problem-solving court before entry of criminal conviction) & 33-23-16-15 (addressing placement in problem-solving court after entry of criminal conviction).

[33] To enter a problem-solving court program, a participant must sign a "Participation agreement" – "the legal document . . . filed with the problem-solving court evidencing the participant's agreement to follow the conditions of problem-solving court participation as required by section 19 of these [problem-solving court] rules." Problem-Solving Court Rules, Section 3 "Participation agreement", https://www.in.gov/courts/iocs/files/pscourts-psc-rules.pdf [https://perma.cc/95AR-9B8M] (hereinafter "P-SC Rules"). Section 19(a) of the Problem-Solving Court Rules lists thirteen types of information that should be included in a participation agreement, including "rights the participant must waive in order to participate." Prior to signing a participation agreement, a participant is to be given an "opportunity to review and discuss the participation agreement with an attorney" or must sign a waiver of the right to consult an attorney. P-SC Rules, Section19(b). Participants should also attend an orientation at which the problem-solving court program is explained to "each participant, and when appropriate, the participant's family." P-SC Rules, Section 21.

After admission into a program, problem-solving courts require participants to attend regularly scheduled review hearings, during which the court's team[16] and participants "work together in an effort to overcome the problems" that brought the participants to the court's attention. (App. Vol. 2 at 47.) These review hearings occur as informal proceedings in which witnesses are not sworn and private counsel are not present. *See*, *e.g.*, P-SC Rules, Section 10 ("A problem-solving court judge may initiate, permit and consider ex parte communications with participants, attorneys, problem-solving court staff, problem-solving court team members and others in conjunction with problem-solving court proceedings and the supervision of problem-solving court participants.").

[35] To encourage the modification of participants' behavior, problem-solving courts reward with incentives,[17] punish with sanctions,[18] and order therapeutic adjustments.[19] *See J.T. v. State*, 111 N.E.3d 1019, 1021-3 (Ind. Ct. App. 2018) (detailing sanctions placed on delinquent for violation of conditions of problem-

---

[16] When, as here, the court at issue accepts participants from delinquency cause numbers, the court's team should include a judicial officer, case manager, probation officers, prosecuting attorneys, criminal defense attorneys, and other social service or mental health providers, including a school liaison. P-SC Rules, Section 13. We are unable to tell from the Record before us whether the JPSC had lawyers on its team that attended the regularly scheduled review hearings.

[17] Incentives are "intangible or tangible rewards as a means of increasing desirable behaviors." P-SC Rules, Section 3 "Incentive".

[18] Sanctions are "a punitive response to reduce undesirable behaviors and increase desirable behaviors." P-SC Rules, Section 3 "Sanction".

[19] Therapeutic adjustments are treatment requirements "intended to address unmet clinical or social service needs and are not intended as an incentive or sanction." P-SC Rules, Section 3 "Therapeutic Adjustment". The legislature specifically authorized problem-solving courts to order participants to receive addiction counseling, inpatient detoxification, case management services, daily living skills training, or "medication assisted treatment[.]" Ind. Code § 33-23-16-24.5.

solving court).  The Problem-Solving Court Rules explain, regarding "Incentives, Sanctions, and Therapeutic Adjustments":

> The problem-solving court shall develop and observe written policy and procedure for administering incentives, sanctions, and therapeutic adjustments to participants, including:
>
> (1) The range of behaviors which may result in incentives and examples of incentives awarded by the problem-solving court, including:
>
>> (A) Behavioral criteria for phase advancement and graduation are objective, realistic and clearly defined based on clinical achievements, and
>>
>> (B) Focus on pro-social behavior to reduce undesirable behavior.
>
> (2) The range of behaviors which may result in sanctions, up to and including termination, and the range of sanctions that may be imposed by the problem-solving court, incorporating:
>
>> (A) Proximal and distal goals and behaviors,
>>
>> (B) Progressive disciplinary action, and
>>
>> (C) Specific policy, procedure and practice governing the use of jail sanctions.
>
> (3) The circumstances under which a therapeutic adjustment, as determined by the problem-solving court team in consultation with a treatment provider, may be imposed by the problem-solving court and the behaviors which may elicit these actions.

P-SC Rules, Section 27(a).

[36] If a participant thereafter violates one or more conditions of the "participation agreement" or "case management plan"[20] the problem-solving court may terminate the participant from the program. Ind. Code § 33-23-16-14.5(a). However, the court must use the formal proceedings outlined by that statute. When an allegation of a violation arises, the problem-solving court may: "(1) remand the individual into custody; (2) order a summons to be issued to the individual to appear; or (3) order a warrant for the individual's arrest if there is a risk that the individual may: (A) flee the jurisdiction; or (B) cause harm to the individual or another individual." Ind. Code § 33-23-16-14.5(b). The problem-solving court judge or some other hearing officer must then conduct a hearing regarding the alleged violation, and during that hearing:

> (1) The state must prove the violation by a preponderance of the evidence.
>
> (2) The evidence must be presented in open court.
>
> (3) The individual who is alleged to have committed the violation is entitled to:

---

[20] Indiana Code chapter 33-23-16 does not define case management plan, but the Problem-Solving Court Rules define a "Case plan" as "a plan that documents case management activities that the participant must complete as a condition of problem-solving court participation. These activities shall be based upon the results of risk and needs assessment, if required, in conjunction with any other assessments, the problem-solving court participation agreement and other court orders." P-SC Rules, Section 3 "Case plan".

(A) receive written notice of the alleged violation;

(B) obtain the disclosure of evidence against the individual;

(C) confront and cross-examine witnesses; and

(D) be represented by counsel.

Ind. Code § 33-23-16-14.5(c). *See also* P-SC Rules, Section 28(b) (stating participant rights in termination proceedings include written notice; court hearing; counsel; disclosure of evidence; present, confront, and cross-examine evidence; and proof by preponderance of the evidence). If the judge or hearing officer finds the participant violated the program, the person may be terminated from the problem-solving court program or continued in the program "with or without modifying or expanding the individual's conditions for participating . . . ." Ind. Code § 33-23-16-14.5(e).

## Issue 1: Did the problem-solving statutes authorize the JPSC to deprive Mother of her liberty?

[37] Mother argues Indiana Code section 33-23-16-14.5, which outlines the procedure a problem-solving court should follow to remove a participant from the program, did not authorize the problem-solving court to place Mother in jail. We agree.

[38] As we noted above, a problem-solving court's services are available "only to individuals over whom the court that established the problem solving court has

jurisdiction." Ind. Code § 33-23-16-12. Here, the court that established the problem-solving court was Lawrence County's juvenile court. Juvenile courts, pursuant to the statutes that created them, cannot have jurisdiction over adults. *See D.P. v. State*, 151 N.E.3d 1210, 12 (Ind. 2020) ("the language of the jurisdictional statute, Indiana Code section 31-39-1-1(1), is clear: in delinquency proceedings, a juvenile court has subject matter jurisdiction only if the alleged offender is a 'child.' . . . [T]he definition of a 'child' does not include individuals twenty-one or older, I.C .§ 31-9-2-13(d)[.]"). Thus, the JPSC did not have jurisdiction over Mother unless it obtained jurisdiction over her by some other process.

[39] There are processes by which parents of juvenile delinquents can be ordered to "participate in a program of care, treatment, or rehabilitation for the child." Ind. Code § 31-37-12-6. As part of a dispositional decree, a juvenile court can order a parent to:

> (1) obtain assistance in fulfilling the obligations as a parent, guardian, or custodian;
>
> (2) provide specified care, treatment, or supervision for the child;
>
> (3) work with a person providing care, treatment, or rehabilitation for the child; and
>
> (4) participate in a program operated by or through the department of correction.

Ind. Code § 31-37-19-24. However, courts must follow specific statutory procedures for entering such decrees. *See* Ind. Code ch. 31-37-15 (outlining procedures); *and see* Ind. Code § 31-32-2-3 (in a proceeding to determine whether parent should participate in program of care, treatment or rehabilitation of child, a parent has a right to compel witnesses and evidence, introduce evidence, and cross-examine witnesses). A failure to follow the statutory procedure for ordering parental participation is itself a denial of due process. *See In re A.W.*, 756 N.E.2d 1037, 1046 (Ind. Ct. App. 2001) (holding father and stepmother were denied the due process procedures provided by Title 31 when they were ordered to participate in delinquency proceedings for child without notice of the allegations that could impact their rights and a formal hearing). The record before us does not demonstrate such a petition was filed and adjudicated prior to Mother being ordered to participate in the JPSC.

[40]    If we assume that Mother was properly ordered to participate in the JPSC, the next question is whether the statutes defining problem-solving courts authorized the JPSC to place Mother in jail. The only statute in chapter 33-23-16 that references deprivation of liberty -- without a person having already been terminated from a problem-solving court program -- is Indiana Code section 33-23-16-14.5. That section permits a problem-solving court to "remand the individual into custody" if there is an allegation that the individual violated a condition of the problem-solving court. Ind. Code § 33-23-16-14.5(b). Mother argues, however, that language is "applicable to the primary participant, and not a parent participant like C.A." (Appellant's Br. at 16.) After considering

the language in section 14.5 and the remainder of the statutes in chapter 16, we agree.

[41] First, section 33-23-16-14.5 allows problem-solving courts to "remand the individual into custody" for an alleged violation of a condition of the participation agreement or case management plan. However, to "remand" a person into custody is to "send back" or return the person to custody to await further proceedings, https://www.dictionary.com/browse/remand [https://perma.cc/LLS5-46BP]. Mother's participation in the JPSC did not originate with her being "in custody" for allegedly committing a crime or having been found guilty of committing a crime. Rather, Mother's participation in the JPSC began because her son was "in custody" for committing the delinquent act of stealing a truck, which incidentally was alleged to have occurred after K.W. threatened Mother and pointed a gun at her. There is no pre-existing custody into which Mother can be remanded and, as such, the language of section 14.5 suggests that it does not apply to Mother.

[42] Moreover, looking at the remaining sections of chapter 16 indicates the statutes do not apply to Mother. Indiana Code section 33-23-16-12(d) states: "The board shall adopt rules prescribing minimum eligibility criteria for an individual to participate in a problem solving court program." The Problem-Solving Court Rules indicate an "Eligible individual" is "an individual who meets the

eligibility criteria as defined in IC 33-23-16-13."[21]  P-SC Rules, Section 3 "Eligible individual".  Section 13 of Indiana Code chapter 33-23-16 indicates a person is eligible to participate only if:

> (1) the individual meets all of the eligibility criteria established by the board under section 12 of this chapter;
>
> (2) the judge of the problem solving court approves the admission of the individual to the problem solving court program; and
>
> (3) the individual is referred to the problem solving court as a result of at least one (1) of the following:
>
>> (A) A condition of a pretrial diversion program . . . .
>>
>> (B) The procedure described in section 14 of this chapter.
>>
>> (C) The procedure described in section 15 of this chapter.
>>
>> (D) A condition of probation.
>>
>> (E) A condition of participation in a community corrections program under IC 11-12-1.

---

[21] Similarly, the Problem-Solving Court Rules define a "Participant" as "any person who meets the eligibility criteria under IC 33-23-16-13, has signed a problem-solving court participant agreement and has been admitted to the problem-solving court by the problem-solving court judge."  P-SC Rules, Section 3 "Participant".  Mother is not a "Participant" for the same reason she is not an "Eligible individual" – because she does not meet any of the eligibility criteria in Indiana Code section 33-23-16-13(3).

(F) A condition of participation in a forensic diversion program under IC 11-12-3.7.

(G) A condition of a community transition program under IC 11-10-11.5.

(H) A condition of parole.

(I) An order in a dispositional decree under IC 31-34-20 to participate in a family dependency drug court if the individual is a parent, guardian, or another household member of a child adjudicated a child in need of services.

(J) A condition of an informal adjustment program under IC 31-37-9.

(K) Involvement in:

    (i) a child in need of services proceeding;

    (ii) a child support proceeding;

    (iii) a mental health commitment; or

    (iv) a civil protection proceeding.

(L) A condition of an informal adjustment program under IC 31-34-8.

(M) A condition of a misdemeanor sentence.

(N) A condition of a program authorized by the:

(i) judge of a problem solving court; and

(ii) department of correction or the county sheriff.

K.W. was referred to the problem-solving court as a "condition of probation[,]" Ind. Code § 33-23-16-13(3)(D), but none of the referral sources in subsection (3) apply to Mother. Accordingly, Mother does not meet the eligibility criteria for participating in a problem-solving court as the primary participant, and the statutes in Indiana Code chapter 33-23-16 do not apply to Mother. Thus, Indiana Code section 33-23-16-14.5 could not have authorized the JPSC to deprive Mother of her liberty.

[43]     This does not mean that a problem-solving court is without the power to deprive the liberty of a parent who violates a court order while participating in a problem-solving court program with a child. It simply means the court must either: (a) follow the statutory procedures provided for holding a person in indirect contempt, or (b) obtain an adequate waiver of the rights at issue. Unfortunately, here, the JPSC did neither.

## Issue 2: Did the JPSC comply with the statutes for indirect contempt?

[44]     Juvenile courts have statutory authority to punish for contempt. Ind. Code § 31-32-14-1 (indicating court should use processes in "IC 34-47"). As our Indiana Supreme Court recently reiterated, contempt proceedings arise from disobedience of the court that "undermines the court's authority, justice, and

dignity." *Finnegan v. State*, 240 N.E.3d 1265, 1269 (Ind. Sept. 5, 2024) (quoting *City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind. 2005)).

> Indirect contempt involves acts that are "committed outside the presence of the court 'which nevertheless tend [ ] to interrupt, obstruct, embarrass or prevent the due administration of justice.'" [*State v.* ]*Heltzel*, 552 N.E.2d [31,] 34 [(Ind. 1990)] (quoting 6 Ind. Law Encyc. Contempt § 2). These acts often "undermine the activities of the court but fail to satisfy one of the other direct contempt requirements." [*In re*] *Nasser*, 644 N.E.2d [93,] 95 [(Ind. 1994)] (quoting *Hopping v. State*, 637 N.E.2d 1294, 1296 (Ind. 1994)). Unlike direct proceedings, indirect contempt proceedings involve statutory procedures to afford due process protections. *Reynolds* [*v. Reynolds*], 64 N.E.3d [829,] 832-33 [Ind. 2016].

*Id*. at 1270. Mother's failure to follow the orders of the JPSC occurred outside the courtroom and therefore constituted indirect contempt. *See* Ind. Code § 34-47-3-1 (defining indirect contempt as the "willful disobedience of any process, or any order lawfully issued").

[45] "[A] court's authority to find a person in [indirect] contempt rests on whether a trial court has strictly complied with the statutory requirements set forth in the rule to show cause statute." *Reynolds*, 64 N.E.3d at 833. Those statutory requirements are found in Indiana Code section 34-47-3-5, which states:

> (a) In all cases of indirect contempts, the person charged with indirect contempt is entitled:
>
> > (1) before answering the charge; or

(2) being punished for the contempt;

to be served with a rule of the court against which the contempt was alleged to have been committed.

(b) The rule to show cause must:

(1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;

(2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and

(3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

(c) A rule provided for under subsection (b) may not issue until the facts alleged to constitute the contempt have been:

(1) brought to the knowledge of the court by an information; and

(2) duly verified by the oath of affirmation of some officers of the court or other responsible person.

Ind. Code § 34-47-3-5. Thus, a court cannot punish a parent for indirect contempt of a court order without providing that parent with advance notice via

a rule to show cause.[22] *See Stanke v. Swickard*, 43 N.E.3d 245 (Ind. Ct. App. 2015) (father denied due process when trial court found him in indirect contempt because rule to show cause failed to meet statutory requirement to notify father of allegations against him); *In re Paternity of C.N.S.*, 901 N.E.2d 1102, 1106 (Ind. Ct. App. 2009) (trial court could not hold father in contempt for failing to pay child support when father contested ability to pay and court had not complied with the rule to show cause statute). The JPSC did not provide Mother with notice of the allegations against her before it deprived her of her liberty by imposing house arrest and incarceration, and thus we cannot hold the JPSC provided Mother the process she was due under the contempt statute.

## Issue 3: Did the JPSC obtain a valid waiver of Mother's rights?

[46] Because some of Indiana's problem-solving courts are "a forensic diversion program akin to community corrections and probation[,]" *Withers v. State*, 15 N.E.3d 660, 665 (Ind. Ct. App. 2014) (discussing drug court), we have held that, as with those other diversion programs, problem-solving court participants can waive rights that they would otherwise have for the privilege of engaging in a program that allows them to avoid incarceration. *See Perry v. State*, 13 N.E.3d

---

[22] A failure to strictly comply with the rule to show cause statute can be excused if the alleged contemnor "had clear notice of the accusations against him or her." *Reynolds*, 64 N.E.3d at 833 (quoting *In re Paternity of J.T.I.*, 875 N.E.2d 447, 451 (Ind. Ct. App. 2007)). Here, the record does not suggest that Mother received notice of the violations prior to arriving for the JPSC's status hearings.

909, 912-3 (Ind. Ct. App. 2014) (drug-court participant "receives considerable benefits, in return for which he gives up a plethora of substantive claims and procedural rights") (cleaned up) (quoting *House v. State*, 901 N.E.2d 598, 600 (Ind. Ct. App. 2009)).  While Mother was not engaging in the problem-solving court to avoid incarceration,[23] we nevertheless do not doubt that she could waive any rights she had.  *See*, *e.g.*, *State v. Ellis*, 167 N.E.3d 285 (Ind. 2021) (discussing waiver of search and seizure rights in home detention contract); *Dadouch v. State*, 126 N.E.3d 802 (Ind. 2019) (discussing waiver of right to jury trial in misdemeanor case); *A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d 606, 613-14 (Ind. 2018) (discussing waiver of respondent's right to appear at civil commitment hearing); *D.M. v. State*, 949 N.E.2d 327 (Ind. 2011) (discussing juvenile's waiver of *Miranda* rights).

[47]     Mother arrived in the problem-solving court because her son was adjudicated a delinquent child.  When Mother, Grandmother, and K.W. were ordered to enter the JPSC, a document entitled "Terms and Conditions of Participation in the [JPSC]" was signed.  (App. Vol. 2 at 47.)  Grandmother was K.W.'s legal guardian and her signature legibly appears in the form in one of the lines for a "Parent/Guardian" to sign.  (*Id.* at 49.)  K.W. signed on both a "Participant" line and the second "Parent/Guardian" line.  A signature that *could* be

---

[23] She may have been participating to avoid termination of her relationship with K.W., as the failure of a parent to participate in the rehabilitation of a delinquent child as ordered by a court "can lead to the termination of the parent-child relationship under IC 31-35." Ind. Code § 31-37-15-4(b).  However, the record before us does not demonstrate whether Mother was informed of that possible consequence.

Mother's appears on the line for "Counsel", but that signature is not similar to the way Mother signed her name on the three other documents in the record that contain her signature. (Compare *id*. at 49 with *id*. at 91, 92, & 97.) Accordingly, we are not certain that Mother signed the Terms and Conditions of Participation in the JPSC, such that she could have thereby waived her right to due process prior to being held in contempt.

[48] The Terms and Conditions of Participation in the JPSC informed parents that sanctions could be imposed "against the participant and/or parent by the Juvenile Problem-Solving Court Juvenile Referee." (*Id*. at 48.) In addition, the document indicated: "The range of sanctions for parents include verbal warnings from the case manager, team members, and/or from the Juvenile Referee, community service, electronic monitoring, and if necessary, jail." (*Id*. at 49.) But nothing in the Terms and Conditions explained that Mother was waiving her rights to due process or statutory contempt protections prior to being incarcerated. *Contra* P-SC Rule, Section 19 (Participation agreement must contain "list of right the participant must waive in order to participate in the problem-solving court."); *and contra* P-SC Rule, Section 27(a)(2)(C) ("The problem-solving court shall develop and observe written policy and procedure for administering incentives, sanctions, and therapeutic adjustments to participants, including . . . the range of sanctions that may be imposed by the problem-solving court, incorporating . . . Specific policy, procedure and practice governing the use of jail sanctions.").

The Circuit Court order placing Mother in the JPSC required Mother to "participate and cooperate fully" with the problem-solving court's program. (App. Vol. 2 at 43.) That order informed Mother that "[f]ailure to cooperate with program requirements will subject you to program sanctions and/or contempt proceedings." (*Id.*) The order does not, however, explain the difference between "sanctions" and "contempt proceedings." It does not explain what behaviors by Mother would subject Mother to either or what process Mother would be due before either was imposed on Mother. It does however suggest that Mother retained the statutory and due process rights for indirect contempt proceedings.

While we acknowledge that citizens "may waive [their] right to procedural due process," *Gosha v. State*, 931 N.E.2d 432, 434-35 (Ind. Ct. App. 2010), the inadequacies of the participation agreement provided by the JPSC, in addition to the open question of whether Mother even signed that form, lead us to conclude we simply cannot hold that Mother waived her right to formal contempt proceedings herein.

In closing, we encourage Indiana's problem-solving courts to follow this sage advice from retired judge William G. Meyer:

> [T]he best practice would dictate that, when [a problem-solving court] participant contends that he or she did not engage in the conduct that is subject to a jail sanction, the court should give the participant a hearing with notice of the allegations, the right to be represented by counsel, the right to testify, the right to cross-examine witnesses, and the right to call his or her own witnesses.

Hon. William G. Meyer (Ret.), The Drug Court Judicial Bench Book 170 (Nat. Drug Ct. Institute 2011).

## Conclusion

[52] We address whether the JPSC had the authority to deprive Mother of her liberty without notice and a formal hearing under the public interest exception to the mootness doctrine because it has not been addressed, it is complicated, and it is likely to recur as problem-solving courts proliferate. The statutes defining problem-solving courts do not give the JPSC the authority to deprive Mother of her liberty without following statutory process for holding Mother in indirect contempt of court. While Mother could have waived her right to due process prior to deprivation of her liberty, the record before us does not demonstrate Mother knowingly waived her rights. Accordingly, we reverse the JPSC's orders placing Mother on house arrest and ordering her to serve time in jail.

[53] Reversed.

Vaidik, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Daniel A. Dixon
Lawrence County Public Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana